THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE WESLEY, Defendant-Appellant.

First District (5th Division)    No. 77-644

Opinion filed September 29, 1978.

Ralph Ruebner and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ellen Dienes, and Alan D. Lyons, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was indicted for murder. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) After his first trial ended in a mistrial, the jury at his second trial convicted him of the lesser included offense of voluntary manslaughter. (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(a).) At both trials, defendant proceeded pro se. The trial judge sentenced him to the penitentiary for a period of not less than 5 and no more than 15 years. On appeal, defendant contends that the State failed to prove him guilty of voluntary manslaughter beyond a reasonable doubt. We affirm.

The State's first witness, Roosevelt Luie, testified that at approximately 6 p.m. on August 12, 1975, he and some of his friends were playing baseball in a gravel lot across the street from the housing projects at 5001 and 5041 South Federal. He heard a window break and immediately looked over at the buildings. After having first looked at 5041 South Federal, he noticed a man pulling on a screen on the ninth floor in one of the apartments at 5001 South Federal. He later identified People's Exhibit #1 as a photograph of the building at 5001 South Federal. On the photograph, he indicated where he was positioned at the time of the incident and drew a circle around the window where he had seen the man. The window was later identified as being part of apartment #902, the apartment of the deceased. Luie testified that the man he had seen was wearing a brown shirt and was trying to pull the screen into the apartment.

At this point, Luie told his friends to look up at the window. When Luie next looked up, he saw a woman sitting in the window. Her back was facing the witness and there was a man standing in front of her. She

appeared to be trying to pull herself back into the room. The woman was screaming and had made two attempts to pull herself back into the room. She fell from the window backwards, flipped, landed on her face, and then bounced onto her back. When she fell, Luie saw defendant, whom he had known for about a year from the building.

After the woman had fallen, Luie ran over to her. He recognized her as Eloise Moore.[1] Luie had known the deceased and her family for about three years. After awhile, Luie saw defendant kneeling over the body. Within 15 minutes, the police arrived. At the time, Luie told only one person, Theresa Richmond, that "that man [referring to defendant] pushed her out the window." Later that evening, he went to the police station and told a police officer what he had seen happen.

On cross-examination, Luie testified that while he was playing baseball, he was not positioned so that he was looking directly at the window in apartment #902. He testified that he was standing at the southwest corner of the building. When the glass broke, he looked first at the 5041 building. He scanned the floors going from the bottom to the top and only after doing this did he look to the 5001 building. He first looked at the second floor, then he looked at the ninth floor when he saw a man pulling out the screen. Luie did not know how the woman got in the window. However, he did testify that he saw the man's hands in the area of the woman's chest. He did not know what the man was doing with his hands and he did not see anybody push her out the window. He did, however, state that the woman was trying to get back into the room.

Danny Morris stated that he too was playing baseball at approximately 6 p.m. on August 12, 1975. He first looked at the window on the ninth floor of the 5001 building when Luie called his attention to it. He later identified People's Exhibit #2 as a photograph of the building at 5001 South Federal. He indicated on the photograph where he was positioned at the time of the incident and drew a circle around the window where he had looked. The window was later identified as part of apartment #902.

When he looked at the window, he saw a man and woman "tussling." He later identified defendant as the man he had seen in the window. He said that the man pushed the woman and she was trying to get back into the window. The woman was facing inside the apartment. Morris said that he could only see the man's brown shirt sleeves and the side of his face. He could not recall whether the woman was screaming. Morris' testimony concerning the events after the fall substantially corroborates Luie's.

During cross-examination, Morris testified that during the baseball game he was positioned directly across from the 5001 building. He was

---

[1] The record refers to the deceased as Eloise Moore and Ellawea Moore. We refer to her as Eloise solely for the sake of consistency.

between 100 and 150 feet from the building. His left side was facing the window. When Luie told him to look up at the 5001 building, he looked to where the noise was coming from and noticed a man and woman "tussling" or fighting.

Morris also testified that he did not see any broken windows or anybody pulling on a screen. The first thing that he saw was the woman sitting in the window. He said that the man's hands were on the woman's chest, but he later testified that he was not certain that the man's hands were on her. When asked by defendant how he could say that defendant was the one he had seen in the window after having only seen the side of his face, he stated that "I know it was you, because you came downstairs."

Robert Moore, one of the deceased's sons, testified that he lived with his mother. He stated that he had known defendant for two years and that defendant visited their apartment almost every night.

During cross-examination, Moore testified that he did not actually see anyone push anyone out of the window. When asked by defendant whether he had spoken with any of his brothers about what had happened, he testified that he had spoken with his eight-year-old brother, Anthony. Anthony told him that defendant had "checked" their mother around the neck and then pushed her out the window. Moore also testified that he did not like defendant.

Officer James Scott of the Chicago Police Department testified that at 6:45 p.m. on August 12, 1975, he went to Provident Hospital to observe the body of Eloise Moore. While there, he noted that both her arms were broken, there were contusions about her body, and there were lacerations on her left ankle and her left index finger. Joseph Claparols, a pathologist, performed an autopsy on the deceased. The results of the autopsy indicated that the deceased had suffered multiple injuries, including fractures and substantial hemorrhages. He stated that the injuries were consistent with a fall from a height of 75 feet.

On cross-examination, Claparols testified that the injuries would result whether a person had been pushed or had fallen from a ninth floor window. He also testified that he found no cuts on deceased's left hand.

Norbert Rajewski, a crime lab technician, and Scott both viewed apartment #902 on the night of August 12, 1975. Each testified that he did not notice anything unusual about any of the rooms, other than the bedroom. In the bedroom, they noticed that the window had been taken out and propped up against the wall just beneath the windowsill. They both testified that the window was broken. They also testified that the screen had been pulled in and the screen frame had been bent inwards. Rajewski took photographs of the window area. Both he and Scott identified People's Exhibits 5 and 6 as being those photographs depicting the window area as they had seen it that night. Rajewski testified that he

attempted to take fingerprints from the window area, but that he could only find smudges.

On cross-examination, Scott testified that prior to viewing apartment #902, he had been told by an officer that when the deceased fell from the window a number of people had told the officer that the "man in the brown short sleeve shirt pushed Miss Moore." Scott also testified that when he viewed the bedroom he noticed that the bed was two feet from the window and said that he supposed that one could jump from the bed to the windowsill. He also stated that the window could have been broken by hand and that the deceased could have cut herself on the glass.

Scott testified that he interviewed defendant at 9 p.m. on August 12, 1975. Defendant told Scott that he and the deceased were "fighting and tussling" in the apartment. Defendant said that she ran from him back into the bedroom and he followed her. Once he was there, he saw her knock out the window with her hand and then jump out face forward.

Ten minutes later, Scott conducted another interview of defendant. This time defendant told him that he did not enter the bedroom until he heard the glass break. When he entered, he saw her kick out the screen and then jump from the window.

On cross-examination, Scott testified that only he and his partner, Officer Oravetz, were present when defendant was interviewed. He said that the second interview occurred approximately two minutes after the end of the first interview.

Assistant State's Attorney Ozog stated that at 9 p.m. on August 12, 1975, he was called in by Scott. At approximately 9:20 p.m., with Scott and Oravetz present, Ozog interviewed defendant. Defendant told him that he had gotten to apartment #902 before Eloise arrived and waited for her at the kitchen table. When she came in, he announced to her that he was breaking off their common law marriage. An argument then took place. Eloise started running around the kitchen table banging chairs up against the table. Defendant and Eloise began pushing and shoving each other. This lasted until defendant pushed her against the wall. She then began hitting her head and back against the wall. Defendant stated that he asked her why she was doing that. She said nothing and went into the bedroom. Defendant said that he just waited in the kitchen. When he heard glass break, he went into the bedroom and saw Eloise pushing the glass from the window with the palm of her hand. She then jumped on the windowsill and started to dive face forward out the window. Defendant stated that he tried to stop her but was unsuccessful. Ozog testified that at the time defendant was telling this story, he was wearing a brown short sleeve shirt.

Ozog asked defendant if he would give a statement to a court reporter; defendant agreed. However, when the reporter arrived, defendant

refused to give the statement. When told by Ozog what he would be charged with, defendant stated that it could never be proven because the only witness was a "seven year old punk."

After Ozog's testimony, the State asked that the court admit Exhibits 1, 2, 5, and 6 into evidence. Defendant objected to the admission of Exhibits 1 and 2. The court admitted all the Exhibits into evidence. Afterwards, the State rested. The defense also rested without calling any witnesses.

OPINION

The sole issue on this appeal is whether the State proved defendant guilty of voluntary manslaughter beyond a reasonable doubt. The relevant portions of section 9—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(a)) provide:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

\* \* \*

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

Defendant contends that the State did not meet its burden in proving voluntary manslaughter in that it failed to establish that defendant was acting under a sudden and intense passion resulting from serious provocation. *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218; *People v. Thompson* (1973), 11 Ill. App. 3d 752, 297 N.E.2d 592.

In reviewing a finding of a trier of fact we will not disturb that finding "unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt." (*People v. Diaz* (1976), 38 Ill. App. 3d 447, 453, 348 N.E.2d 199, 205; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 21, 327 N.E.2d 225, 232.) Therefore, we must review the evidence in this case to determine if it upholds the jury's finding that defendant was acting under a sudden and intense passion resulting from serious provocation beyond a reasonable doubt.

It is well established that mutual quarrel or combat is sufficient to support a finding of serious provocation. (*People v. Crews* (1967), 38 Ill. 2d 331, 335, 231 N.E.2d 451, 453; *People v. Clark* (1973), 15 Ill. App. 3d 756, 758, 305 N.E.2d 218, 220; *People v. Stepheny* (1966), 76 Ill. App. 2d 131, 134, 221 N.E.2d 798, 800.) In *Stepheny*, the trial court found that evidence of a quarrel of some duration over a crap game was sufficient to support a finding of serious provocation.

■■ In the case before us, the mutual quarrel or combat was over the breakup of a common law marriage. Three witnesses offered testimony

that defendant was fighting with the deceased. Morris testified that when he first looked up at the window in apartment #902, he saw a man and woman "tussling" or fighting. Officer Scott testified that defendant had told him that he and the deceased had been "fighting and tussling" prior to the deceased's plunge from the ninth floor window. Finally, Assistant State's Attorney Ozog stated that defendant had told him the details about the fight. Defendant had said that an argument had taken place shortly after he announced to the deceased that he was breaking off their relationship. The argument grew into a pushing and shoving match which culminated in defendant pushing the deceased against a wall. We find that the testimony of these three witnesses was sufficient support for a finding of serious provocation.

■■■ We also find that there was sufficient evidence to support a finding that defendant was acting under a sudden and intense passion at the time of the incident. In addition to the testimony of the witnesses as to the fight between defendant and the deceased, the testimony on the breakup of the common law marriage is significant here. Courts have found that the breakup of a marital-type relationship is a type of situation which can give rise to sudden and intense passions. (*People v. Curwick* (1975), 33 Ill. App. 3d 757, 338 N.E.2d 468; *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608; *People v. Newberry* (1970), 127 Ill. App. 2d 322, 262 N.E.2d 282.) The physical evidence introduced by the State further demonstrates that defendant was acting under a sudden and intense passion. Exhibits 5 and 6 were photographs which depicted the bedroom scene in apartment #902. These photographs showed that the screen had been ripped inward. The frame had been bent. Luie testified that he saw defendant pull in the screen. We think that this evidence together with the evidence of the breakup in the relationship and the ensuing argument and fight supports a finding that defendant was acting under a sudden and intense passion.

Defendant contends that the only evidence of what actually took place inside the apartment on August 12, 1975 is his statements to Officer Scott and Assistant State's Attorney Ozog. He argues that if the jury accepts part of his statements, they must accept all of them, including the portion which supports his contention that the deceased jumped out the window. We refuse to accept this argument.

In *People v. Sykes* (1977), 45 Ill. App. 3d 674, 359 N.E.2d 897, the court was faced with a similar argument. There the court noted:

"When the defendant testified as to what happened, he must tell a reasonable story or be judged by its improbabilities. * * * The jury is not required to accept the defense offered and summarily reject the State's evidence just because the defendant was the only witness to the actual shooting. * * * Instead, the jury may

consider other facts and circumstances in the record which tend to contradict the defendant's story or raise serious questions regarding its probability and it is the realm of the trier of fact to determine if there was a causal relationship between the defendant's conduct and the decedent's death." 45 Ill. App. 3d 674, 679-80, 359 N.E.2d 897, 901.

■■■ In this case the jury apparently chose to accept some of defendant's statements and to reject others. This is clearly proper for it is the role of the trier of fact "to weigh the testimony, judge credibility of witnesses, and determine factual matters in debatable sets of circumstances." (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 19, 327 N.E.2d 225, 231. See also *People v. Sykes* (1977), 45 Ill. App. 3d 674, 680, 359 N.E.2d 897, 901.) We find that there was sufficient other support on the record to support the jury's findings.

■■ Lastly, we note that a defendant cannot complain of a conviction for voluntary manslaughter when the record discloses evidence sufficient to sustain a murder conviction. (*People v. Sykes* (1977), 45 Ill. App. 3d 674, 679, 359 N.E.2d 897, 901; *People v. Young* (1973), 11 Ill. App. 3d 609, 614, 297 N.E.2d 298, 302.) A conviction for the lesser-included charge of voluntary manslaughter will not be altered on review unless the finding is palpably and unreasonably contradictory to the evidence. (*People v. Sykes* (1977), 45 Ill. App. 3d 674, 679, 359 N.E.2d 897, 900-01; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 21, 327 N.E.2d 225, 233.) We make no such finding in this case.

For the foregoing reasons, we affirm defendant's conviction for voluntary manslaughter.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.