THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ESTEBAN FLORES, Defendant-Appellant.

Second District   Nos. 2—86—1091, 2—86—1171 cons.

Opinion filed April 25, 1988.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert F. Casey, State's Attorney, of Geneva (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Esteban Flores, appeals his conviction of murder entered in the circuit court of Kane County. Defendant contends that the trial court erred in refusing to give his tendered instruction on the lesser included offense of voluntary manslaughter and in admitting hearsay evidence of the decedent's state of mind.

The victim was defendant's wife, Virginia Flores. Defendant and decedent had been married for approximately 10 years at the time of the killing and lived in Aurora with their six-year-old daughter, Marissa, and David Marquez, decedent's son from a previous marriage. Apparently, the Floreses had been having marital difficulties for some time prior to the killing. Defendant had suspected his wife of marital infidelity for the previous eight months. About two weeks before the incident, decedent consulted an attorney, Eugene Griffin, about instituting dissolution of marriage proceedings.

At about 10 p.m. on July 15, 1983, defendant asked David Marquez if he wanted to spend the night with his sister, Migdalia, and offered to give him a ride. David refused, and defendant sent him to bed. Defendant then fell asleep himself, lying across the bed and sleeping with his clothes on. David testified that defendant kept a loaded .357 revolver in the house.

Defendant woke David about 3 o'clock the next morning and told him to call an ambulance. Defendant was nervous and crying and would not say why an ambulance was needed. David went to the kitchen, picked up the phone, and dialed 911. He set the receiver down and ran to his mother's bedroom, where he found her with what appeared to be a gunshot wound. He returned to the kitchen and told the operator to send the police and an ambulance. Defendant, meanwhile, had left in his car. Virginia Flores was pronounced dead at 4 a.m. Defendant went to see his brother, who drove him to his sister's house in Jersey City, New Jersey, where he stayed for three months before turning himself in to Aurora police.

On November 1, 1983, defendant was indicted for the murder of his wife. David Marquez, in addition to the facts related above, stated that approximately two weeks before the incident, defendant asked him if his mother was seeing another man. David answered that she was not. Defendant responded that if David was lying he would kill her. Migdalia Marquez, decedent's daughter, Leandro Gonzalez, decedent's brother-in-law, and Emeteria Melendez, decedent's mother, also testified that defendant talked about killing decedent if she obtained a divorce.

Griffin testified that the decedent consulted him about a dissolu-

tion of her marriage in early July 1983, and that she appeared upset and nervous. She told Griffin that defendant had threatened her, accused her of infidelity, and called her employer on numerous occasions to see if she was working.

Defense counsel objected to Griffin's testimony on hearsay grounds before trial, but the trial court reserved ruling. Immediately before Griffin testified, defense counsel renewed his objection. Counsel stated:

> "Any statements that would be offered by the deceased to her lawyer are clearly hearsay and I think they have to be. Although Counsel has argued earlier that it goes to show the intent or state of mind of the deceased, I think it is really offered to the truth of the matter asserted."

The court permitted Griffin to testify that decedent had sought a divorce and also to testify in general terms that defendant had threatened her. The court did not permit him to testify as to details of these threats.

Defendant testified in his own behalf. On the day of the killing, he left work at 2 p.m. because he felt ill. At about 10 p.m., he put Marissa to bed, then took two pills and went to sleep himself. The next thing he remembered was being awakened by his wife. At his wife's insistence, defendant got out of bed. Defendant testified as follows:

> "Q. Okay. *** Was there ever a time in your marriage that you knew your wife wanted a divorce?
>
> A. Yes.
>
> Q. When was the first time you knew that?
>
> A. About eight months ago she say that.
>
> Q. What did she say?
>
> A. She say she want to divorce me because she say I want to be married to little midget.
>
> Q. Little midget?
>
> A. Yes, sir."

Defendant concedes that, read literally, the "little midget" remark refers to the stature of decedent's lover. However, defendant argues that taken in context, and given his difficulties with the English language and the fact that he is 5 feet 6 inches tall and weighs 130 pounds, that this statement should be read as referring to defendant. The State does not dispute that this remark referred to defendant. In context, it is at least a reasonable inference that the "little midget" remark was an insulting reference to defendant. Furthermore, read literally, this remark would have been made eight months

prior to the killing. This would be inconsistent with virtually all the other evidence in the case, which indicated that defendant only suspected his wife was having an affair and that his suspicions were not confirmed until the night of the killing.

Defendant responded that his brother had told him that she was working overtime because she had a boyfriend at work. His wife retorted, "Yes, I got a boyfriend on the job, I bring him right here in this bed." Defendant began crying and shaking. His wife continued, saying that she would take his house, his car, all his money, and his baby, referring to Marissa. Defendant then drew the gun from a chest of drawers near the bed and pointed it at his wife. Defendant told his wife that she could have the house, the car, and the money, but she could not take his baby. Defendant then shot his wife.

Defendant's further testimony described his actions immediately after the shooting, his flight to New Jersey, and subsequent return to Illinois. Following defendant's testimony, the defense rested. At the instructions conference, defendant tendered jury instructions and verdict forms outlining the offense of voluntary manslaughter. (Illinois Pattern Jury Instructions, Criminal, Nos. 7.03, 7.04 (2d ed. 1981).) The court refused the tendered instructions, and the jury was instructed only on the offense of murder. The jury found the defendant guilty of murder, and the court subsequently sentenced him to 20 years in prison.

Defendant's counsel did not file an appeal within 30 days of sentencing. On September 24, 1986, defendant filed a petition for post-conviction relief, alleging that he was denied a fair trial by the trial court's refusal to instruct the jury on voluntary manslaughter and that he was denied the effective assistance of counsel by his attorney's failure to file a timely appeal. The trial court found no error on the instruction issue, but found that defendant had been denied the effective assistance of counsel and permitted the filing of a late notice of appeal. Defendant subsequently filed two notices of appeal, one challenging his original conviction and the other from the denial of the count of his post-conviction petition based on the manslaughter instruction. This court consolidated the appeals.

■ Defendant's first issue in these consolidated appeals is that he was entitled to an instruction on the offense of voluntary manslaughter based on strong provocation. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a).) He bases his argument primarily on this court's recent decision in *People v. Ambro* (1987), 153 Ill. App. 3d 1. In that case, we acknowledged the general rule that words alone cannot be sufficient provocation to reduce the charge from murder to manslaughter.

(*Ambro*, 153 Ill. App. 3d at 5.) On the facts of that case, however, we found that the evidence of provocation was sufficient that the trial court should have given defendant's tendered manslaughter instruction.

The facts of *Ambro* are extremely similar to those of the instant case. Defendant and the decedent had been married for approximately 10 years but had recently been having difficulties. Defendant became suspicious that his wife was having an affair, and the decedent met with an attorney to file a dissolution petition. Defendant was in the kitchen, in the process of washing several knives, when his wife said, "I have another man and when we make love I feel like it was." She also called him an alcoholic and told him that he had no right to the children. Defendant stabbed his wife with one of the knives. (*Ambro*, 153 Ill. App. 3d at 2-3.) Although recognizing the general rule noted above, we found that these facts fell within a narrow exception to the rule where, in conjunction with other circumstances, the wife informs the husband of her ongoing adultery. (*Ambro*, 153 Ill. App. 3d at 5.) This exception was first recognized in *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 1041-42, and was later applied in *People v. Carr* (1980), 91 Ill. App. 3d 512, 517-18, *cert. denied* (1981), 454 U.S. 848, 70 L. Ed. 2d 136, 102 S. Ct. 167 (see also *People v. Newberry* (1970), 127 Ill. App. 2d 322). Although those cases were appeals from voluntary manslaughter convictions, the *Ambro* majority found that the same evidentiary standard should apply to a murder defendant who seeks an instruction on the lesser included offense of manslaughter. *Ambro*, 153 Ill. App. 3d at 6.

The State responds that *Ambro* was wrongly decided and should be overruled. Further, it contends that *Ahlberg* and *Carr* were wrongly decided and that this court should disavow reliance on those decisions. Instead, the State urges us to adopt the rationale of the dissent in *Ambro*. The dissent emphasized Illinois's long-standing reliance on the rule that words alone can never be provocation and that, since *Ahlberg* and *Carr* merely held that the evidence was sufficient to affirm manslaughter convictions, their rationale should not be extended to entitle a defendant convicted of a more serious offense to a new trial based on the failure to give a voluntary manslaughter instruction. (*Ambro*, 153 Ill. App. 3d at 9 (Lindberg, P.J., dissenting).) The State suggests that *People v. Harris* (1984), 123 Ill. App. 3d 899, provides the better basis of decision.

We decline the State's invitation to reexamine our *Ambro* decision. We are not inclined to overrule such a recent decision absent a compelling reason for doing so. The State has not provided such a

reason. We rejected in that case the State's argument that *Ahlberg* and *Carr* should not be extended to cover the instant situation. It is well established that the trial court must give a requested instruction where there is some evidence in the record which would reduce the offense to voluntary manslaughter. (*People v. Petty* (1987), 160 Ill. App. 3d 207, 210; *People v. Coleman* (1984), 124 Ill. App. 3d 285, 289.) If the evidence in *Ahlberg* and *Carr* was sufficient to support the defendant's convictions of manslaughter, it follows that a defendant who presents evidence of a similar situation has presented some evidence which would reduce the offense to manslaughter.

*People v. Harris* (1984), 123 Ill. App. 3d 899, on which the State relies, is distinguishable. In that case, the defendant already knew his wife was seeing another man, but did not believe that she was committing adultery. Further, she did not confront him with that fact or insult him immediately prior to the shooting. (*Harris*, 123 Ill. App. 3d at 906.) In the instant case, as in *Ambro*, defendant and his wife had been having marital difficulties for some time, decedent had spoken with an attorney about a divorce, and on the night of the killing she belligerently told her husband about her affair, belittled him, and threatened to take their daughter from him.

The State argues that, unlike *Ambro*, defendant already suspected his wife of having an affair, and thus her bedroom revelation could not have come as a shock to him. The State misreads both the facts and the basis of the decision in that case. It is clear that the defendant in *Ambro* suspected his wife of having an affair. (*Ambro*, 153 Ill. App. 3d at 3.) The basis for the finding of provocation was not the shock of her revelation, which could not have surprised defendant, but the way in which she taunted him with it and belittled his sexual proclivity. These same factors are present in the instant case, and the defendant in the instant case has met his burden and is entitled to a new trial.

■ Because the issue may arise at retrial, we also consider defendant's second argument, that the court erred in permitting attorney Griffin to testify that decedent told him that defendant threatened her. The State argues that the testimony was admissible to show the decedent's state of mind. State of mind statements are admissible if two elements are shown: (1) the declarant is unavailable and (2) there exists a reasonable probability that the testimony is truthful. But such statements must be relevant to a material issue in the case. (*People v. Silvestri* (1986), 148 Ill. App. 3d 980, 984.) In *People v. Floyd* (1984), 103 Ill. 2d 541, the supreme court rejected a similar argument on nearly identical facts. The court found that,

while the state of mind of the decedent may be relevant in some instances, such as to rebut a defense of accident, such circumstances were not present in that case, where defendant admitted that his wife had already filed for divorce and had resisted his sexual advances. The court stated, "Under the circumstances, evidence of the statements concerning her fear of harm served no purpose other than to create the inference that defendant was guilty of murder." *Floyd*, 103 Ill. 2d at 547.

The State cites several cases, particularly *People v. Jurczak* (1986), 147 Ill. App. 3d 206, *People v. Lang* (1982), 106 Ill. App. 3d 808, and *People v. Goodman* (1979), 77 Ill. App. 3d 569, and argues, *ipse dixit*, that these cases are factually similar to the instant case while *Floyd* is distinguishable. In fact, even a cursory examination of these opinions reveals the opposite to be true. As we have just determined, *Floyd* is indistinguishable from the instant case on salient points. In *Jurczak*, the challenged evidence was relevant to show a history of marital violence, thus rebutting defendant's insanity defense. In *Lang*, evidence of marital discord was relevant to rebut defendant's contention that the marriage was a happy one. (*Lang*, 106 Ill. App. 3d at 814-15.) In *Goodman*, evidence of decedent's conversations was relevant to rebut defendant's self-defense claim. (*Goodman*, 77 Ill. App. 3d at 574.) The State also cites *People v. Cherry* (1980), 88 Ill. App. 3d 1048, which does appear to follow a contrary rule. However, to the extent that case is in fact inconsistent, we are bound to follow the more recent authority of the supreme court in *Floyd*.

In the instant case, defendant admitted that he shot his wife and never contended that it was self-defense or an accident. He had long suspected her of having an affair. Thus, introduction of the decedent's statements could not have served any purpose other than to prove the truth thereof, *i.e.*, that defendant had a preexisting intention to harm her if she attempted to obtain a divorce. As such, the evidence was hearsay and should not have been admitted. (*People v. Huber* (1985), 131 Ill. App. 3d 163, 166.) As one Supreme Court justice recently stated, "It is precisely to avoid the possibility of such use of 'state of mind' evidence that at least eight States and one Federal Court of Appeals have precluded or sharply limited the introduction of evidence of the victim's state of mind in homicide cases." (*Boliek v. Missouri* (1986), 479 U.S. 903, 905, 93 L. Ed. 2d 276, 277-78, 107 S. Ct. 302, 303 (Marshall, J., dissenting from denial of *certiorari*).) Should the issue arise at retrial, Griffin should not be permitted to testify concerning the decedent's statements about

threats the defendant made to her. Because the cause must be retried in any event, we need not consider the State's argument that the error was harmless.

For the foregoing reasons, defendant's conviction is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

INGLIS and DUNN, JJ., concur.