THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID McCARTHY, Defendant-Appellant.

First District (5th Division)   No. 1—85—2485

Opinion filed March 23, 1989.

Randolph N. Stone, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Laura J. Diamant, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant David McCarthy appeals his jury conviction for murder. The fact that defendant shot and killed Adrienne Neal is undisputed. The record contains the following additional facts.

Defendant and Adrienne began dating in 1974 when they were both high school freshmen. In 1978, they had a child and then lived together for six months in 1979. After a second child was born to Adrienne and defendant in 1981, they again lived together until April 3, 1983 (Easter), when Adrienne ended the relationship and moved, with the two children, initially into her mother's home and then into her own apartment. The couple were never legally married. On the day Adrienne moved out, her mother testified that defendant went to her home and smashed the windows of a car parked in the driveway belonging to Adrienne's father. Two weeks later, defendant again went to the Neal home and physically assaulted Adrienne and her mother. Defendant denied these acts.

Early in May, Adrienne began dating an old grade school friend, Winifred Johnson, and defendant began "seeing" Michelle Gardner. Approximately 10 days before the shooting incident, defendant was referred by his probation officer to Englewood Mental Health Center and told a therapist that he was depressed and was having homicidal and suicidal thoughts. On June 3, defendant bought a gun. Three days later, he picked up Michelle, who testified that they drove around for about an hour and stopped several times, looking for some marijuana. Michelle said that she did not notice anything unusual about defendant and that there was no evidence that he had been drinking. Defendant testified that they had just driven around talking about Adrienne and the children and that they never stopped for marijuana. Around 11 p.m., defendant parked near Adrienne's apartment building and, taking an object from beneath the seat, left

Michelle in the car and went to the back of the building.

Defendant went up to Adrienne's second-floor apartment and knocked on the back door. Adrienne's sister, Anita, who was in the kitchen with her boyfriend, Woodrow McGuire, let defendant in. McGuire testified that earlier in the evening, defendant had gone to McGuire's house and said, "I know Anita is hiding behind the door, tell her to take her last look." Anita and McGuire then went to Adrienne's house. Adrienne and Johnson came home and went into the bedroom. According to Anita and McGuire, defendant came into the kitchen and pointed a gun seven to eight inches away from Anita's face and then knocked her to the floor, pulled her up again putting the gun to her head, and then dropped her back to the floor. Neither McGuire nor Anita saw any signs that defendant had been drinking.

Defendant then went to the bedroom, where he shot Adrienne five times. Johnson testified that he and Adrienne had fallen asleep in their underwear while watching television when they were awakened by Anita's screams. They had both jumped out of the bed when defendant burst in and shot at Johnson, grazing him. Johnson ran out of the room and jumped off the back porch. Anita, McGuire, and Johnson all heard more shots as they were fleeing. The evidence shows that Adrienne was shot from two to six feet away. Defendant then fled to California, and Michelle followed to give him some belongings his mother had sent, after which Michelle returned to Chicago.

Defendant, and his sister, testified that after the Easter breakup, he became extremely depressed, suicidal, and began drinking heavily. Although not legally married, defendant stated that he thought of Adrienne as his "wife." He also testified that he did not threaten Anita and that he had purchased the gun to kill himself, and that when he went to Adrienne's home, he intended to kill himself if she refused to reconcile.

The record also indicates that defendant was seeing other women both before and after the Easter breakup, and that he, in fact, married one of them, Raydell Lacey, six months after killing Adrienne. In January 1984, defendant, accompanied by counsel, turned himself in to the police.

Before trial, the court granted the State's motion *in limine* barring the testimony of the mental health therapist and also denied a defense motion to bar evidence of other crimes, *i.e.*, breaking the car windows and the batteries against Adrienne and her mother. In the opening statement, defense counsel conceded that defendant

shot his "common law wife" but asserted that the shooting was manslaughter resulting from the provocation of seeing her in bed with another man. However, the trial court refused to instruct the jury on voluntary manslaughter and defendant was convicted of murder and subsequently sentenced to 34 years' imprisonment.

On appeal, defendant contends that the trial court committed error in refusing to give a voluntary manslaughter instruction, in permitting admission of other crimes evidence and barring the therapist's testimony, and further, that defendant's sixth amendment right to effective assistance of counsel was denied because his attorney conceded that defendant had shot Adrienne.

Defendant bases his voluntary manslaughter defense on the long, "marital-type" relationship between him and Adrienne, the breakup of which caused him to become extremely depressed with homicidal and suicidal thoughts. Under such circumstances, the sight of finding his "wife" in bed with another man caused him to act in the heat of passion when he killed her. Defendant asserts that there was evidence in the record suggesting provocation so that the jury, not the court, was entitled to determine the sufficiency thereof. The State argues that a marital-type relationship cannot give rise to serious provocation and, even if it could, there was no such relationship here since it had ended several months prior to the killing.

■ Voluntary manslaughter is a lesser included offense of murder and is a legal compromise between murder and exoneration. (*People v. Dare* (1986), 140 Ill. App. 3d 413, 488 N.E.2d 1304.) Voluntary manslaughter occurs when a person kills another without lawful justification while acting under a sudden and intense passion resulting from serious provocation; serious provocation is conduct sufficient to excite an intense passion in a reasonable person. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).) Where there is evidence in the record which, if believed by the jury, would reduce the crime of murder to manslaughter, the appropriate instruction should be given. (*People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82.) Moreover, whether the provocation is sufficient to cause intense passion is a matter to be determined by the trier of fact (*People v. Yates* (1978), 65 Ill. App. 3d 60, 382 N.E.2d 421) and a defendant is entitled to have the jury consider any legally recognized defense theory that has some foundation in the evidence, however tenous. *People v. Dortch* (1974), 20 Ill. App. 3d 911, 314 N.E.2d 324.

■ The categories of serious provocation recognized by Illinois courts are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. (*Peo-

*ple v. Fausz* (1983), 95 Ill. 2d 535, 449 N.E.2d 78.) Thus, the issue in the present case is whether, on the facts of this case, defendant's heat of passion defense can be legally recognized under the spousal adultery category of provocation. We find that it can, and therefore a voluntary manslaughter instruction should have been given to the jury.

In 1970, this court in *People v. Newberry* (1970), 127 Ill. App. 2d 322, 262 N.E.2d 282, sustained a conviction of manslaughter of a depressed and suicidal defendant who had killed his girlfriend of three years several weeks after she ended the relationship. There is no indication in *Newberry* as to whether the defendant and victim had been living together. However, it was in the later case of *People v. Wesley* (1978), 65 Ill. App. 3d 25, 382 N.E.2d 358, that this court recognized that the breakup of a marital-type relationship is an occurrence that can cause a sudden and intense passion resulting from provocation sufficient to reduce murder to voluntary manslaughter. While it is true, as the State points out, that in *Wesley* there was also mutual quarrel or combat, it is also apparent that the court recognized that "the testimony on the breakup of the common law marriage is significant here. Courts have found that the breakup of a marital-type relationship is a type of situation which can give rise to sudden and intense passions. [Citations.]" (*Wesley*, 65 Ill. App. 3d at 31, 382 N.E.2d at 362.) We note here that it has also been recognized, contrary to common law, that under certain circumstances, words informing a spouse of adultery can be the basis for provocation. *People v. Flores* (1988), 168 Ill. App. 3d 636, 522 N.E.2d 876; *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608.

Of course, the breakup of a marital-type relationship will not always support a voluntary manslaughter instruction. (See, *e.g., People v. Miller* (1981), 96 Ill. App. 3d 212, 421 N.E.2d 406 (argument over breakup of relationship insufficient provocation where deliberation and malice were evidenced); *People v. Pequino* (1978), 62 Ill. App. 3d 75, 379 N.E.2d 30 (killing occurred one year after breakup of relationship).) While we also agree that the breakup of a relationship does not always entitle a defendant to a manslaughter instruction, such an instruction should have been given in the present case.

■■ This case contains an element missing in the cases referred to above—it is undisputed that defendant found Adrienne and Johnson in their underwear, either in bed according to defendant, or near the bed according to Johnson. Defendant testified that he was depressed and suicidal when he went to Adrienne's apartment to effect a reconciliation and, if unsuccessful, had planned to kill himself.

Whether this was provocation sufficient to reduce the murder charge to manslaughter is an issue that should be resolved by a jury. Very slight evidence upon a given theory will justify a manslaughter instruction. (*People v. Williams* (1987), 164 Ill. App. 3d 99, 517 N.E.2d 745.) Defendant submitted evidence that he was distraught and suicidal over the breakup, had persistently attempted to reconcile, and found Adrienne, the mother of his two daughters, in bed with another man. These and other considerations urged by the State—*e.g.,* whether defendant had a girlfriend after the breakup, the two-month lapse between the breakup and killing—are factors to be considered by a jury in determining whether defendant killed Adrienne with malice or in the heat of passion. Accordingly, it was reversible error not to give a voluntary manslaughter instruction in this case.

■ Since we must remand this case for a new trial, defendant's other issues on appeal need only be briefly addressed. His objection to the admission of the "other crimes or bad acts" evidence that he committed batteries on Adrienne and her mother approximately six weeks before the killing is without merit. Although other crimes evidence is inadmissible if relevant only to establish a defendant's propensity to commit the crime charged (*People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949), it may be admitted if relevant for other purposes (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840). One of the accepted purposes is to show intent. *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.

■ In our case, in order to counter a defense of manslaughter, the State would have to prove defendant killed Adrienne with intent rather than in the heat of passion. The State further argues that the bad acts evidence was relevant to demonstrate the type of relationship that existed between defendant and Adrienne after their breakup. This also is a valid rationale for admission of the evidence. (See *People v. Crayton* (1988), 175 Ill. App. 3d 932, 530 N.E.2d 651; see also *People v. Groleau* (1987), 156 Ill. App. 3d 742, 509 N.E.2d 1337 (defendant's altercation with his wife three weeks prior to her murder admissible to show motive and his state of mind).) Therefore, it was not error to admit the prior bad acts of defendant.

■ Similarly, there was no error in the denial of the testimony of the mental health therapist regarding defendant's state of mind 11 days prior to Adrienne's death. The defense of heat of passion depends on a defendant's state of mind immediately prior to the killing, not what he was thinking 11 days before the event. As a result of our conclusions, there is no need to address the ineffectual assist-

ance of counsel allegation.

For the above reasons, we reverse and remand this matter for a new trial.

Reversed and remanded.

COCCIA, J., concurs.

JUSTICE PINCHAM, concurring in part and dissenting in part:

While I concur in the majority's holding that the trial court erred in refusing to give a voluntary manslaughter instruction and in the reversal of the defendant's murder conviction and remandment for a new trial, I dissent to the majority's holdings that evidence of the defendant's "other crimes or bad acts" was admissible against the defendant and "there was no error in the denial of the testimony of the mental health therapist regarding defendant's state of mind 11 days prior to Adrienne's death." 181 Ill. App. 3d at 213.

The deceased, Adrienne Neal, discontinued living with the defendant, moved out and ended her relationship with him on April 3, 1983. Clearly, the testimony of Adrienne's mother that the defendant on that date smashed the windows of Adrienne's father's car had absolutely no probative value on any issue in the case and was inadmissible on the defendant's trial for the murder of Adrienne on June 6, 1983. This act by the defendant on April 3, 1983, was a manifestation of the defendant's hostility towards Adrienne's father at that time. It did not and it could not have established the defendant's state of mind two months later on June 6, 1983, when he killed Adrienne. This is also true of Adrienne's mother's testimony of the defendant's assault upon her and Adrienne two weeks after their April 3, 1983, breakup. Likewise, the testimony of Michelle Gardner that before the shooting she and the defendant stopped several times, looking for marijuana, had no probative value, was highly prejudicial and was inadmissible. If the prosecution was unable to make a case against the defendant confined to the gory facts of the instant homicide by the eyewitnesses, it should not have been allowed to buttress its case with the foregoing irrelevant inflammatory evidence. *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Grabbe* (1986), 148 Ill. App. 3d 678, 499 N.E.2d 499; *People v. Davis* (1984), 130 Ill. App. 3d 41, 473 N.E.2d 387; *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667; *People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155; see dissenting opinions in *People v. Howard* (1988), 169 Ill. App. 3d 536, 541-81,

523 N.E.2d 943; *People v. Hayes* (1988), 168 Ill. App. 3d 816, 821-44, 523 N.E.2d 1327; *People v. Partin* (1987), 156 Ill. App. 3d 365, 374-94, 509 N.E.2d 662; *People v. Harris* (1986), 147 Ill. App. 3d 891, 896-909; see *People v. Wachal* (1987), 156 Ill. App. 3d 331, 340-44, 509 N.E.2d 648 (Pincham, J., specially concurring).

The defendant was charged with and on trial for the June 6, 1983, murder of Adrienne Neal, during which trial he was compelled to defend against evidence of his commission of four separate, independent earlier offenses: (1) criminal damage to Adrienne's father's car; (2) and (3) assaults upon Adrienne and her mother; and (4) a conspiracy with Michelle Gardner to acquire marijuana, an illegal drug. Most assuredly, the prejudicial impact of this evidence clearly outweighed any probative value this evidence may remotely have had and it should not have been admitted. None of this evidence was admissible to and did not establish the defendant's intent at the time he shot Adrienne.

Moreover, the defendant's intent was not an issue in this case. The State's eyewitnesses established, it was uncontested, the defendant admitted that he shot Adrienne—five times—and that he intended to shoot her and that he intended to kill her. His defense was not lack of intent. Such a defense on the facts in this case would have been absurd. Conversely, the defendant's defense, as stated in his attorney's opening statement, was that the shooting was voluntary manslaughter, that the defendant shot Adrienne under a sudden and intense passion resulting from the serious provocation of the defendant seeing Adrienne in bed with another man. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2 (presently second degree murder, Ill. Rev. Stat. 1987, ch. 38, par. 9—2).) It was clearly erroneous to have admitted this evidence of the defendant's "other crimes as bad acts."

If evidence of the defendant's damage to Adrienne's father's car on April 3, 1983, and evidence of the defendant's assault upon Adrienne and her mother two weeks later was admissible to establish the defendant's intent, *i.e.,* his state of mind, when he shot Adrienne five times two months later, as the majority holds, certainly then the mental health therapist's testimony "regarding defendant's state of mind 11 days prior to Adrienne's death" was likewise admissible to establish his state of mind at the time the defendant shot her. If "the defense of heat of passion depends on a defendant's state of mind immediately prior to the killing, [and] not [on] what he was thinking 11 days before the event," as the major-

ity holds (181 Ill. App. 3d at 213), the same rule likewise applies to the defendant's state of mind of intent, *i.e.,* "the defendant's state of mind immediately prior to the killing" and not what the defendant's state of mind was, not "11 days before the event," but rather, two months "before the event."

Accordingly, I dissent to the majority's holdings that the aforementioned evidence of the defendant's "other crimes or bad acts" was admissible and that the aforementioned testimony of the mental health therapist was inadmissible.