(No. 68576.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DAVID McCARTHY, Appellee.

*Opinion filed November 22, 1989.*

Neil F. Hartigan, Attorney General, of Springfield,

and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund and Mark A. Shlifka, Assistant State's Attorneys, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (James H. Reddy, Assistant Defender, of counsel), for appellee.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, David McCarthy, was convicted of murder and sentenced to a term of 34 years' imprisonment. The appellate court reversed the defendant's conviction and remanded the cause for a new trial, finding reversible error in the trial judge's refusal to instruct the jury on voluntary manslaughter in addition to murder. (181 Ill. App. 3d 208.) We allowed the State's petition for leave to appeal (107 Ill. 2d R. 315(a)).

The victim in the present case was Adrianne Neal, with whom the defendant had previously enjoyed a long-standing romantic relationship. The defendant and Adrianne began dating in 1974, while freshmen in high school. The couple eventually had two children—one daughter was born in 1978, and a second in 1981—and they lived together from 1978 or 1979 until 1983, with one or two brief interruptions. The defendant and Adrianne never married. Early in April 1983, Adrianne and the children moved out of the apartment they shared with the defendant. After living for a short time with Adrianne's mother, Adrianne and the two children moved to their own apartment. On June 7, 1983, the defendant entered Adrianne's apartment, found her lying in bed with another man, Winfred Johnson, and shot both of them. Johnson survived, but Adrianne died as a result of the shooting. The autoptic evidence disclosed

that Adrianne was shot a total of five times, and that several of the shots were fired at close range; the cause of death was determined to be a bullet wound to the head. Following the murder, the defendant fled to California. The defendant later returned to Chicago, and he surrendered to police on January 11, 1984.

Adrianne's sister, Anita Neal, and Anita's boyfriend, Woodrow McGuire, were present when the defendant entered Adrianne's apartment on June 7. At trial, they testified that they had seen the defendant earlier the same evening at Woodrow's home. The defendant pulled up in his car around 9:30 and spoke to Woodrow. The defendant's two daughters and a woman whom neither Anita nor Woodrow recognized were also in the car. The defendant seemed upset, and he told Woodrow to inform Adrianne that she would never see the children again. The defendant next turned toward the house and said, "I know Anita is standing inside the door. Tell her to take her last look." The defendant then drove off.

Anita and Woodrow testified that they went to Adrianne's apartment following their encounter with the defendant. They arrived around 10:45, but no one was home at the time. Anita and Woodrow returned to the apartment at 11:30 and found both Adrianne and her boyfriend, Winfred Johnson, there. Anita related to her sister what the defendant had said earlier that evening. Adrianne and Winfred then retired to the bedroom, and Anita and Woodrow worked a crossword puzzle in the kitchen.

About 15 or 20 minutes later, the defendant let himself into the apartment through the back door and entered the kitchen. The defendant knocked Anita to the floor, grabbed her by the collar, and held a gun to her head. Woodrow told the defendant not to shoot, and the defendant then released Anita and walked down the hallway toward the bedrooms. Anita and Woodrow fled from

the apartment through the rear exit, jumping from the back porch onto the ground below. The apartment was on the second floor, and, according to the evidence, the back stairs of the building were undergoing renovation at the time. Anita and Woodrow heard several shots being fired, and they called the police from a nearby store. Both Woodrow and Anita testified that they did not smell alcohol on the defendant's breath and that his eyes did not appear bloodshot.

Winfred Johnson had known Adrianne and her family for more than 10 years, and he had been dating Adrianne for several months before she was killed. Winfred testified that on June 7, 1983, he picked Adrianne up from work and that they returned to Adrianne's apartment later that evening. After Anita and Woodrow arrived, Adrianne spoke with her sister and then joined Winfred in the bedroom. Winfred testified that they fell asleep in their underwear while watching television. He was awakened by Anita's screams and got out of bed. The defendant entered the bedroom and fired a handgun at both Winfred and Adrianne; a bullet grazed Winfred's chest. Winfred ran to the back porch and jumped to the ground below.

Michelle Gardner also testified in the State's behalf at trial. She met the defendant late in 1982 and began dating him shortly after that. Michelle testified that from April through June 1983 she saw the defendant two or three times a week. According to Michelle, the defendant would talk about his two children but not about Adrianne. Michelle testified that the defendant picked her up during the evening of June 7, 1983. The defendant stopped and talked to someone at one point. Over the defendant's objection, Michelle testified that the defendant made several other stops that evening in an attempt to purchase marijuana. Michelle said that she did not smell alcohol on the defendant's breath, that his

eyes did not appear bloodshot, and that he did not have any difficulty driving. According to Michelle, the defendant was laughing and joking as usual and did not seem sad or depressed. Later, the defendant stopped near an apartment building, retrieved an object from under his seat, and got out of the car. The defendant returned to the car after 10 minutes and quickly drove off. Michelle testified that a day or two later the defendant told her that he had shot Adrianne.

Over defense counsel's objection, the State was permitted to introduce evidence of two prior incidents in which the defendant committed acts of violence toward Adrianne and her family. Adrianne's mother, Mrs. Jacqueline Neal, testified that on April 3, 1983, the day Adrianne left the defendant, the defendant came to their house and broke the windows of a family member's car. Mrs. Neal also testified to a second incident that occurred about two weeks later, on April 14. On that occasion, Mrs. Neal and Adrianne returned home around 9 o'clock one night. As the two women were getting out of the car, the defendant grabbed Adrianne and struck her several times. After striking Mrs. Neal, the defendant ran off.

The defendant acknowledged at trial that he had performed the acts resulting in the victim's death. The defendant maintained, however, that he had been provoked by the sight of Adrianne in bed with another man. Testifying in his own behalf, the defendant said that he was despondent following his breakup with Adrianne in April 1983 and that he began drinking heavily. The defendant said that he cried continually, could not eat or sleep, and felt suicidal. He was then serving a term of probation from an earlier conviction for robbery, and he sought help from his probation officer. The probation officer referred him to a municipal mental health center, and the defendant went there on one occasion in late

May 1983. The defendant testified that he told the people there that he was suicidal and homicidal. The trial judge declined to permit defense counsel to present the testimony of two mental health counselors who were familiar with the defendant's case.

The defendant testified that he went to Adrianne's apartment three times on June 7. He took his older daughter with him the first time so that she could point out where her mother was living. The defendant said that he returned to the apartment around 5:30 or 6 p.m. because he hoped to see Adrianne when she came home from work. The defendant waited awhile and then left for his sister's house when Adrianne failed to appear. Later that evening, the defendant picked up Michelle Gardner and talked to her about the children. He then drove to Adrianne's apartment around 10 or 11 o'clock that night. According to the defendant, he knocked on the back door of the apartment, and Anita let him in. The defendant said that he told Anita that he wanted to talk to Adrianne. The defendant denied that he displayed the gun to either Anita or Woodrow. After speaking with Anita, the defendant walked to the bedroom and opened the door. The defendant explained that he felt deeply hurt when he found Adrianne in bed with another man. The defendant testified that he had meant to ask Adrianne to reconcile with him, and he asserted that he had intended to shoot himself if she refused his request.

The defendant testified that when he returned to the car following the shooting he told Michelle that he had killed Adrianne. The defendant disposed of his gun later that night. He left Chicago soon after the killing, going first to St. Louis and then to California. The defendant eventually came back to the Chicago area, and he surrendered to police on January 11, 1984. The defendant admitted that he married a woman named Raydell Lacey in December 1983, following his return to Illinois. The

defendant had known Lacey for about four years, and he explained that Lacey helped him while he was a fugitive and that she agreed to pay his legal fees if he married her.

One of the defendant's sisters, Dorcia Davis, testified in his behalf at trial. She said that the defendant was distraught following his breakup with Adrianne in April 1983 and began drinking heavily. Dorcia testified that the defendant was drunk when he left her house during the evening of June 7, 1983.

At the close of evidence, the trial judge refused defense counsel's request that the jury be instructed on voluntary manslaughter in addition to murder. The judge reasoned that the absence of a marital relationship between the defendant and the victim precluded the use of such an instruction in the present case. Following deliberations, the jury found the defendant guilty of murder, and judgment was entered on the jury's verdict. The trial judge later sentenced the defendant to 34 years' imprisonment for the offense.

The appellate court reversed the defendant's conviction and remanded the cause for a new trial. The court agreed with the defendant that the trial judge had erred in refusing defense counsel's tendered instructions on the offense of voluntary manslaughter. The appellate court believed that such a verdict should be an available option even in the absence of a marital relationship and that the evidence in this case warranted the use of such an instruction. The appellate court concluded that a new trial was necessary. The court also briefly considered several other issues that were likely to recur on retrial. The court rejected the defendant's arguments that the trial judge had erred in permitting the State to introduce evidence of the defendant's prior acts of violence toward the victim and her family, and in excluding the testimony of the defendant's mental health therapists. Because the

appellate court was granting the defendant relief on his argument that the jury should have been instructed on voluntary manslaughter, the court did not consider the defendant's remaining contention that trial counsel was ineffective in acknowledging to the jury that the defendant had shot the victim. One member of the appellate court panel would have barred the evidence of the defendant's prior misconduct and, further, believed that exclusion of the defense testimony concerning the defendant's mental health treatment was inconsistent with the admission of the other evidence. 181 Ill. App. 3d 208, 214-16 (Pincham, J., concurring in part and dissenting in part).

The form of voluntary manslaughter at issue here is the "heat of passion" variety defined in section 9—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)). At the time of the defendant's offense, section 9—2(a) provided:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a).)

The Criminal Code does not specify what types of conduct or provocation under section 9—2(a) may serve to reduce the offense of murder to voluntary manslaughter. Traditionally, however, those circumstances have been limited in Illinois to four situations. "The only categories of serious provocation which have been recognized are: 'substantial physical injury or assault, mutual quarrel or

combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property.' [Citations.]" (*People v. Crews* (1967), 38 Ill. 2d 331, 335-36; see also *People v. Chevalier* (1989), 131 Ill. 2d 66, 71; *People v. Fausz* (1983), 95 Ill. 2d 535, 539.) In those instances in which voluntary manslaughter is urged as an alternative to murder, voluntary manslaughter may be said to constitute partial or incomplete exoneration for the homicide. See *People v. Alejos* (1983), 97 Ill. 2d 502, 507; *People v. Leonard* (1980), 83 Ill. 2d 411, 420; Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments, at 392 (Smith-Hurd 1979).

There is authority in this State refusing to extend to unmarried persons a partial defense like the one recognized in instances of spousal adultery. (*People v. McDonald* (1965), 63 Ill. App. 2d 475, 480.) That limitation has been questioned, however, "at least in cases where there existed a longstanding relationship comparable to that of husband and wife." (2 W. LaFave & A. Scott, Substantive Criminal Law §7.10, at 259 (1986).) Many of the same reasons that warrant recognition of adultery with a spouse as sufficient provocation under the voluntary manslaughter statute would also be applicable in the absence of a marital relationship. Thus, it would appear that limiting availability of the partial defense to the spousal relationship would find its primary justification in some additional matter of policy rather than in the merits of the individual claim. For example, Illinois has not recognized the validity of common law marriages since the early part of this century (see *Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 62-63; Ill. Rev. Stat. 1983, ch. 40, par. 214), and therefore it could be argued that allowance of the partial exculpation of voluntary manslaughter in the circumstances described would be inconsistent with that longstanding expression of public policy.

Because the instruction would not be available in the present case, we need not determine here whether the category of serious provocation already recognized in instances of spousal adultery should be enlarged to include unmarried persons who share a marital-type relationship. In this case, the victim had broken off her relationship with the defendant some two months before the homicide occurred, and she and the couple's two children were no longer living with the defendant. Just as divorced persons may not claim the benefit of the voluntary manslaughter instruction, there would be no reason to afford the same instruction to unmarried persons whose relationship has ended. Previous cases have stated that the provocation of adultery will not warrant use of the voluntary manslaughter instruction when the spouses are already divorced at the time of the homicide. (See *People v. Strange* (1980), 81 Ill. App. 3d 81, 88; *People v. Wood* (1979), 72 Ill. App. 3d 919, 923.) Although those decisions may be explained as having simply recognized the longstanding view that adequate provocation will not be found in the absence of a spousal relationship, we decline in any event to fashion a rule that would permit use of the voluntary manslaughter instruction when the relationship in question has effectively ended, as was the case here. See *People v. Pequino* (1978), 62 Ill. App. 3d 75, 79.

Moreover, there is no evidence, apart from the defendant's own testimony, that the defendant's actions were engendered by a sudden and intense passion, as required by statute. The defendant's conduct following the breakup of his relationship with Adrianne—including his acts of violence toward Adrianne and her family, his repeated visits to her apartment on the day of the homicide, his unauthorized and armed entry of the premises, and his apparent involvement with at least one other woman—suggests that the defendant was stalking the

victim and intended to kill her. "It is well settled that if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction tendered by the defendant must be given. [Citations.] It is equally well settled, however, that such an instruction should not be given if the evidence clearly demonstrates that the crime was murder, and there is no evidence to support a conviction of manslaughter. [Citations.]" (*People v. Handley* (1972), 51 Ill. 2d 229, 235.) Under the circumstances shown here, refusal of a voluntary manslaughter instruction would have been proper in the present case, even if the law did recognize, as adequate provocation, sexual relations with a person to whom the offender was not married but with whom the offender shared a marital-type relationship.

The defendant, appellee in the present appeal, raises as grounds for cross-relief several issues that were decided adversely to him by the appellate court in its consideration of questions likely to recur on retrial. (See 107 Ill. 2d R. 318(a).) The defendant first argues that the trial court erred in permitting the State to introduce evidence of his prior acts of violence toward Adrianne and her family. Mrs. Jacqueline Neal, Adrianne's mother, was permitted to testify that the defendant broke the windows of a family member's car on April 3, 1983, the day Adrianne moved out of the apartment she shared with the defendant, and that the defendant struck both Adrianne and Mrs. Neal less than two weeks later, on April 11. The appellate court ruled that the evidence was properly admitted. We agree.

As a general rule, evidence of other acts of misconduct committed by a defendant is not admissible as proof of the defendant's propensity to commit crime. (*People v. McDonald* (1975), 62 Ill. 2d 448; McCormick, Evidence §190, at 557-58 (3d ed. 1984); M. Graham, Handbook of Illinois Evidence §404.5, at 162-63 (4th ed. 1984).) It is

well established, however, that evidence of a defendant's prior misconduct may be admitted, in an appropriate case, if it is offered for a purpose other than to show the defendant's propensity to commit crime. *People v. Stewart* (1984), 105 Ill. 2d 22, 61-62; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Lehman* (1955), 5 Ill. 2d 337, 342-43.

The evidence in question satisfied that criterion. Evidence of a defendant's prior acts of violence toward a victim has been admitted as proof of the defendant's intent at the time of the commission of the offense charged (see *People v. Manzella* (1973), 56 Ill. 2d 187, 195-98), and admission of the evidence at issue here was warranted on similar grounds. Contrary to the defendant's view, his intent or state of mind was at issue in this case, notwithstanding the defendant's own testimony that he shot the victim. The testimony regarding the defendant's prior acts of violence toward Adrianne and her family tended to show the defendant's intent to harm her. Clearly, that evidence supported the State's theory at trial that the defendant was driven by anger at the breakup of his relationship with the victim, and that he did not commit the homicide while acting under a sudden passion.

The defendant makes the related contention that the trial judge erred in overruling defense counsel's objection to Michelle Gardner's testimony regarding the defendant's search for marijuana in the hours preceding the shooting. That testimony tended to contradict the defense claim that on the day of the homicide the defendant was preoccupied with the breakup of his relationship with Adrianne. Moreover, any error in the introduction of the testimony was, we believe, harmless in light of the strong evidence of the defendant's guilt.

The defendant next contends that the trial judge erred in excluding certain testimony concerning the

defendant's request for treatment at a community mental health center several weeks before the homicide occurred. Before trial, the State filed a motion *in limine* to exclude the testimony of employees of the community mental health center where the defendant sought treatment in late May 1983, shortly before Adrianne's murder. The trial judge reserved ruling on the motion. During the defendant's case in chief, defense counsel offered the testimony of two employees of the mental health center, who would have testified that the defendant complained of depression and expressed homicidal and suicidal feelings. One of the employees had spoken with the defendant, but the other had not; apparently, however, both employees were familiar with the defendant's case. The trial judge excluded the evidence as irrelevant, finding no causal connection between the defendant's commission of the offense and his earlier complaints of depression. The appellate court similarly believed that the testimony was irrelevant to the defendant's state of mind at the time of the offense here and upheld the trial judge's exclusion of the evidence. It may be noted that the trial judge permitted the defendant to testify regarding his emotional condition in the period between his breakup with Adrianne and the shooting. The defendant was also allowed to testify regarding his visit to the mental health center and the complaints he made on that occasion of being depressed and of having suicidal and homicidal feelings.

Contrary to the defendant's argument, we find no inconsistency in the admission of the evidence of his prior acts of violence toward the victim and her family and the exclusion of the testimony of the mental health employees. The evidence of the defendant's prior acts of violence tended to show that the defendant was angry over the breakup of his relationship with Adrianne. The defendant's prior complaints of depression and suicidal

and homicidal feelings, however, were simply unrelated to his proposed defense that at the time of the murder he was acting under the impulse of a sudden, uncontrollable passion. Accordingly, we find no error in the trial judge's exclusion of that evidence.

As a final matter, the defendant asks that the cause be remanded to the appellate court for consideration of an additional issue that was raised but not decided there: whether he was denied the effective assistance of counsel by his trial attorney's acknowledgement in opening statements to the jury that the defendant had committed the homicide. As we have said, it was the defense theory at trial that the defendant, charged with murder, was guilty only of voluntary manslaughter, a less serious offense. The appellate court did not consider this additional claim, in light of its ruling that the trial court had erred in refusing to instruct the jury on voluntary manslaughter. The parties have not briefed the issue in this court, and therefore we do not choose to resolve the issue here. Accordingly, we remand the cause so that the appellate court may consider this additional question.

For the reasons stated, the judgment of the appellate court is reversed, and the cause is remanded to that court for further proceedings not inconsistent with this opinion.

*Judgment reversed;*
*cause remanded.*