THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE FALLS, SR., Defendant-Appellant.

First District (6th Division) No. 1—90—1803

Opinion filed September 25, 1992.

Kathryn Hall and Jerry B. Kurz, both of Hall & Kurz, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall Roberts, and R. Darnell Granderson, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

After a bench trial, Willie Falls, Sr., was convicted of first degree murder and sentenced to imprisonment for 28 years. He contends he was not proved guilty beyond a reasonable doubt; he was denied effective assistance of counsel; the trial judge erred by failing to recuse himself; and the case should be remanded for a specific finding on whether the conviction should be reduced to second degree murder. We have determined that this case must be remanded for a new trial on the ground of ineffective assistance of counsel; but, to resolve any double jeopardy question, we must first consider the sufficiency of the evidence.

In 1978, Bessie Falls and the defendant divorced after more than 22 years of marriage. Although they never remarried, they reconciled some time during 1982 and began living together again in what had been their marital home at 10505 South Parnell in Chicago. Bessie became romantically involved with Charles Hudson, with whom she

worked. In November 1988 the defendant heard a tape recording of Bessie telling her son, Willie Falls, Jr. (Willie), about some gift she had bought for Hudson. Bessie would see Hudson on Wednesdays, sometimes on Sundays. The defendant was having an affair with Janice Pickett that had gone on for about 16 years; he had fathered one of her children.

On May 11, 1989, Bessie's body was discovered in her car parked in front of a vacant lot at 6130 South Kimbark in Chicago.

Willie testified that on April 29, 1989, he was at his parents' residence shooting pool with his father. At that time the defendant told Willie, "[I] found out where your mother goes and how she goes and how she comes home, and when I catch her, I'm going to kill her ***." Willie heard the defendant threaten his mother twice in the six-month period after the defendant learned of her affair. Willie told his mother to be careful after the defendant's threat of April 29.

On cross-examination, Willie admitted that his father had threatened his mother "all the time." He agreed that there was a "battle of two strong wills" going on between his mother and father and that his mother did what she wanted to when it came to the management of the household. He had also heard his mother threaten his father in the past.

Andrew Hooker, Bessie's brother, testified that in early January 1989 the defendant told him that Bessie was having an affair and that when he caught her he would kill her. Hooker told Bessie about the threat and Bessie replied that she would not leave her house and that if the defendant did kill her to "put [her] away nice."

Charles Hudson testified that he began having a romantic relationship with Bessie in May or June of 1988. On the night she was shot, she arrived at his apartment at 7:45 p.m. and they talked. She made him a salad and drank some Crown Royal. After they made love, she left at about 9:30 p.m. She was carrying a gun in the Crown Royal bag. He knew that Bessie carried a gun, and he had seen her gun under the driver's seat 12 or 15 times when he rode in her car with her.

Detective Leo Wilkosz testified that he examined the crime scene on the morning of May 11. He noticed that the front passenger side window had been blown outward and that Bessie was dead and sitting in an upright position in the passenger seat. Her head was turned slightly to the left and her hands were in her lap. When he opened the driver's side door he saw a brown paper bag under the front left corner of the driver's seat. The butt of a gun was protruding from the bag. A woman's purse was on the floor by Bessie's feet. The purse

was in an upright position as though it had been placed there; the purse appeared slightly open and did not contain any weapons.

On cross-examination, Wilkosz said that he could not tell what position the victim's hands or body was in when she was shot. There were powder burns on Bessie's face. In his opinion, these burns could have occurred if Bessie was shot during a struggle for the gun with the defendant.

Detective Alan Szudarski testified that he arrived at the defendant's home at approximately 7 a.m. on the morning of May 11. The defendant told him that his wife had left the house at 7:45 the night before, that he had not seen her since and that he left the house at 8 p.m.

The following day Szudarski questioned the defendant's girl friend, Janice Pickett. After talking to Pickett, Szudarski questioned the defendant after advising him of his *Miranda* rights. Szudarski told the defendant that Pickett contradicted his story about his whereabouts the night before; the defendant said that Pickett was lying. Szudarski questioned him about one-half hour later and the defendant gave the following statement.

He had been walking to Pickett's house when his wife saw him walking at 103rd and Wentworth. She pulled up and asked where he was going. The defendant answered that he was going to his sister's house. His wife slid over into the passenger side of the car and said, "You drive, and I'll go with you." They discussed their marital problems as they were driving. He drove to 6130 South Kimbark and parked the car.

The defendant brought up their respective affairs. He said that this "must have hit a nerve," because Bessie reached for her purse. The defendant warned her not to reach for her purse because he knew she carried a gun; the defendant had taught her how to use a gun. She continued to reach for her purse so he drew his own gun. She reached for the gun, and he pulled back, took aim and fired three times. After shooting Bessie, he walked through a lot and disposed of the gun in a dumpster near 67th and Stony Island. He then took the bus to Pickett's house and told her, "It's all over now."

It was established by stipulation that Bessie had been shot three times in the face. All three wounds showed evidence of stippling, indicating a close-firing range, and were on the left side of the victim's head. One bullet exited out the right side of her head. Another bullet was recovered from her right jaw. The last bullet was diverted downward and was recovered from her fifth cervical vertebra.

After the State rested, E. Duke McNeil, one of the defendant's attorneys, moved for a finding of not guilty at the close of the State's case. He did not make any argument. The motion was denied, and McNeil said that he expected to finish the next day and that he would have a number of witnesses available at that time.

The next day the defense attorneys rested without putting on any witnesses. The judge found the defendant guilty after hearing closing argument. He said that there was no proof by a preponderance of the evidence that would support a finding of guilty of the charge of voluntary manslaughter. He also said that he did not believe the defendant's account of the incident.

The defendant's argument is that the State's own evidence establishes that he fired in self-defense and that, at best from the State's standpoint, the evidence shows that his belief that he was in danger of losing his life or suffering great bodily harm was unreasonable.

The issue of self-defense is one for the trier of fact. (*People v. Daniel* (1989), 191 Ill. App. 3d 837, 548 N.E.2d 354.) In a bench trial, the functions of the trial judge include determining the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence. (*People v. Colson* (1989), 187 Ill. App. 3d 423, 543 N.E.2d 282.) In reviewing whether the evidence is sufficient to convict, the relevant question is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 189-90.

■■ The evidence supports the judge's finding. The multiple wounds to the face, the defendant's previous threats to kill his wife, the defendant's false statement to the police, his disposition of the weapon, his motive, and the fact that he was armed, all combined to establish proof beyond a reasonable doubt. See *People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547.

We turn now to the defendant's claim that he was denied effective assistance of counsel. After the defendant was indicted his bail was set at $60,000 and he posted a $6,000 bond. He retained the law firm of E. Duke McNeil & Associates. One of the members of that firm, Akim Gursel, filed a motion to quash the arrest and suppress evidence. He also filed motions to suppress statements. On the day the motion to quash the arrest was to be heard, the following occurred:

"GURSEL: Your honor, while Motions are set for today, I will respectfully ask the Court to entertain an oral Motion for

Leave to Withdraw as Mr. Falls' attorney for [the] following reasons:

Mr. Falls and I and Mr. McNeil cannot reach an understanding, first, as to how to proceed as to his case. And, secondly, Judge, that we have attempted to go along with Mr. Falls. And I informed Mr. Falls, I'm not the Public Defender, for professional reasons.

JUDGE: Well, Mr. Gursel, I understand that lawyers like to be paid, but unfortunately I can't intervene on your behalf anymore than I would intervene on the Defendant's behalf, if he thought you charged too much.

GURSEL: I understand that, Your Honor. I'm asking the court to appoint someone who can represent him. Because in all honesty, your Honor, *I don't feel at this point in my career, with a young child in private school and other indebtedness, that I can sit at counsel table and concentrate and give my best to Mr. Falls with him owing me money. It just couldn't happen.*

JUDGE: Well, Mr. Falls, let me say this to you: First of all, you chose to hire Mr. McNeil and Mr. Gursel as your lawyers. At the time you did that, you undertook an obligation to them, and I believe that you want him to fulfill their obligations to you. And I think there is a duty for you to perform your obligation to them.

This case is a case that has been pending for some period of time. I'm not inclined to let those lawyers out of the case. I can tell you that what Mr. Gursel says is not untrue. I have been in situations, and you don't have quite the same fervor for your clients when you sit there and think that he is stiffing you.

DEFENDANT: I understand that, Your Honor.

JUDGE: I don't know what that financial problem is, whether or not you have some or what the situation is. The financial arrangement is between yourself and Mr. Gursel, or Mr. McNeil. But this case is going to proceed ahead to trial to resolve those Motions. And I'm not inclined to let them out of the case. If you want to bring another lawyer in, you may, but the case is going to go forward.

STATE'S ATTORNEY: Judge, can I be heard?

JUDGE: Sure.

STATE'S ATTORNEY: Judge, I understand now that Mr. Falls is out on bond. I think he has posted a substantial bond in

this case. And on that basis, Judge, I don't think it appropriate for the Public Defender to represent him.

Judge, for the record, there are two Motions filed before the Court. And whether counsel feels that is substantial bond, I don't know; but in my mind it is.

Judge, there are two Motions on file by counsel's law firm. A Motion to Quash Arrest, a Motion to Suppress Statements. We are answering ready today on the Motion to Quash Arrest, and we can even begin the second Motion to Suppress Statements.

Judge, the case has been pending for a long time, fairly long time, and we are answering ready. And we would object to appointment of a different counsel.

JUDGE: Well, at this time, as I've indicated, I'm not going to allow your withdrawal.

GURSEL: Judge, I understand this. I don't want to take up your time. I know you have a busy call. Since you are not going to allow me to withdraw, would you at least cut down—consider one of two things:

A. I will do the Motion to Quash Arrest and then the court will allow me to withdraw; or

B. Do the Motion to Quash Arrest and the court appoint me or appoint the Public Defender to go further.

Because, Your Honor, let me say this to you: I personally have—I have monitored Mr. Falls. I hate to discuss this. This is not my nature to discuss this openly.

\* \* \*

JUDGE: Here is what I am going to do. As I've indicated, I think lawyers deserve to be paid. I don't know what the situation is between yourself and Mr. Falls, but as I've indicated, Mr. Gursel, it would unduly, I believe, delay these proceedings if I do not pursue the matter.

One of the things I will contemplate doing, perhaps, is if your posture is—certainly you do have a right to be paid. *And if your client is not cooperating for you to be paid, I might find that to be dilatory on his part. I can certainly revoke those bonds, those—*

MR. GURSEL: *Judge, I'm asking you to revoke his bond and pay me.* \*\*\* I will do the Motion to Quash Arrest. Past that, I believe the court should allow me out and allow the Public Defender—

JUDGE: I'm not going to allow the Public Defender appointed when a Defendant has $6,000 in bond.

GURSEL: *Six Thousand Dollars is not for me to try a homicide, Judge.*

JUDGE: For some lawyers, it is probably more than enough. He has you, Mr. Gursel. We are going to do that Motion today.

I'm going to suggest to you, Mr. Falls, that you talk to Mr. Gursel, because as he said, you want to be at liberty. *I'm not just whistling Dixie when I talk about perhaps revoking the bond; having that money available for your lawyer, so we can move this case ahead.*

Now, if you want to take care of that situation yourself, sometime between now and the date that is set for trial, I suggest you do that. We will do a hearing on the motion today." (Emphasis added.)

The hearing was continued to another date. At the hearing on the motion to quash arrest, Officer Szudarski testified that he went to the defendant's home on May 11 at 6:30 a.m. The defendant was not a suspect at the time; and the defendant left with the police voluntarily to attempt to find other witnesses. He was in the police station approximately 24 hours before he was charged.

The defendant testified that he was taken from his home by the police. He had a pair of pants over his pajamas and wore bedroom slippers because the police would not let him put on his shoes. He was handcuffed in the police car and told he was under arrest.

The judge said that he did not believe the defendant and denied the motion to quash. He noted that the length of time that the defendant was in "custody" before he was placed under arrest was somewhat lengthy. After the judge denied the motion to quash the arrest the following occurred:

"JUDGE: I understand on the matter now is there is a Motion to Suppress Statements. I understand you are going to proceed on that, Mr. Gursel?

GURSEL: No. I'm going to withdraw the Motion to Suppress Statements. At this time I'm going to indicate to the court that we would be proceeding to a jury trial; but most likely it will end up being a bench trial. But I want to leave that option open, because I have to really get serious about which way I'm going to proceed. ***.

* * *

GURSEL: When I say Motion to Suppress Statements, my

client made a number of statements. I might not be making a move to deny all of the statements. Some statements he made I may want to suppress. ***.

\* \* \*

JUDGE: If there are some statements you still wish to proceed on, we will do so.

Mr. Falls, apparently there is some discussion between your lawyer and yourself regarding compensation. Certainly I understand lawyers have a right to be paid. As I told you, Mr. Gursel, I would not allow him out, because you do have a substantial bond on this matter.

I will ask you now, what is your intention with regards to the proceeds of that bond, [once] the case is over?

DEFENDANT: I will give it to the attorney.

JUDGE: I'm telling you this, Mr. Falls, so that everyone will be aware: once you indicate to me out in open court that that is the agreement between yourself and Mr. Gursel, I won't let you change your mind, no matter what happens to this case."

On the next date, both Gursel and McNeil appeared, and the defendant waived a jury. The defendant's attorneys did not pursue any motion to suppress the statements. We note that those motions to suppress the statements were based on grounds other than an alleged illegality of the arrest.

No purpose would be served by discussing the cases cited by the State and the defendant involving whether particular actions constituted ineffective assistance of counsel. None of those cases involved an attorney who manifested an unwillingness or inability to represent the defendant to the best of his ability unless he was paid a particular sum of money or the question of a defendant being compelled to accept an attorney or face the possibility of having his bond revoked. We believe the peculiar facts of this case require that it be retried.

█ Gursel made it clear that he could not give the defendant his complete ability and industry unless he was paid and that even the $6,000 was not enough. We find several things significant. First, the motion to suppress statements based on facts other than an alleged illegal arrest was withdrawn without explanation. The State's Attorney tells us it was trial tactics, but we cannot appreciate the tactical advantage to the defendant when his lawyer did not even try to bar introduction of the crucial piece of evidence against him. Second, the defendant waived the jury. It should be kept in mind that the defendant, by waiving the jury, was placing the fact-finding function in the

hands of the judge, who had already determined on the motion to quash that the defendant had testified falsely and that the police officer had testified truthfully. Whether a defendant should be advised to testify is a lawyer's decision that is generally more wisely reserved until the State's case has been completed. As a practical matter, that decision was made by the attorney before the State's case had begun. We note also that jury trials almost always take longer than bench trials.

We also find significant the fact that the defendant's attorneys rested without calling any witnesses although the day before they had told the court that they intended to call witnesses. No explanation has been provided for the failure to call any witnesses.

The defendant specifically points to the failure to call Detective Armata and Octavia Culps. The defendant's attorney attempted to elicit testimony from Szudarski that the defendant had told him that his wife had threatened him. Szudarski said that the defendant had not made such a statement to him but rather made it to Armata. The judge informed Gursel that he could call Armata and get the entire conversation in evidence. Gursel did not call Armata. Another witness was Octavia Culps, a friend of Bessie. She testified at the post-trial motion that Bessie was happy with her relationship with the defendant just four days before the shooting and that Bessie had had numerous affairs. The State makes no issue of the admissibility of the testimony of Culps and Armata. Instead, the State says simply that the decision to call a witness is a matter of trial strategy. But there is no showing in this record how trial strategy would have dictated not calling Armata or Culps. Finally, we find it most significant and astonishing that Gursel was willing to have his client's bond revoked and his client imprisoned. From all these facts, a strong inference is created that the defendant's attorney wanted to get the case over as quickly as possible.

Added to the implied lack of concern on the part of the defendant's attorney, we have the judge giving the defendant a Hobson's choice of either agreeing to pay his attorney out of the bond proceeds or face revocation of the bond and incarceration or proceeding with a new lawyer, if the defendant was able to hire one, who would not be given an opportunity to prepare. The State does not try to justify the threat to revoke a defendant's bond unless he agreed to pay a lawyer because there is no such justification in the law. Thus, the record shows that the defendant was *forced* to proceed with a lawyer, who stated for the record that he could not represent the defendant with his full "fervor," to use the judge's word, unless he was paid a sum of

money more than the $6,000 the defendant could pay him. Under all these circumstances, we judge that this conviction cannot stand and that the defendant is entitled to a new trial.

Since this case is to be retried we will address another argument of the defendant that may recur. The defendant maintains that the judge misconstrued the law when he determined that the evidence was insufficient to establish that the defendant was acting under a "sudden and intense passion resulting from serious provocation by the individual killed." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1).) It is the defendant's position that the judge refused to recognize that "spousal adultery" may be such a "serious provocation" that would reduce a finding of first degree murder to a finding of second degree murder (or voluntary manslaughter). The defendant, citing *People v. McCarthy* (1989), 132 Ill. 2d 331, 547 N.E.2d 459, argues that the trial court did not, but that this court should, recognize that adulterous behavior of someone other than a spouse can be sufficient to meet the sudden and intense passion requirement of section 9—2. In *McCarthy* the court held that a voluntary manslaughter instruction was not applicable in the case because the parties involved there were no longer in a "marital-type relationship." (132 Ill. 2d at 342.) It is the position of the defendant that Bessie and the defendant, although not married, were involved in a "marital-type relationship."

■ We need not decide whether the law should recognize, as provocation under section 9—2, sexual relations with a third party by a person to whom the defendant was not married but with whom the defendant shared a marital-type relationship. We do so because the trial judge in this case decided, and the evidence supports his decision, that the shooting was not the result of a "sudden" passion. He said Bessie's other relationship was not something newly discovered by the defendant; it was "something that was going on for some period of time on both sides." The judge apparently considered the established case law which holds that adultery of a spouse is sufficient provocation only when the parties are discovered in the act of adultery or immediately before or after such an act, and the killing immediately follows such discovery. *People v. Chevalier* (1989), 131 Ill. 2d 66, 544 N.E.2d 942.

There is a history of marital discord in the relationship between Bessie and the defendant. Such marital discord indicated growing anger or resentment against the spouse rather than the sudden and intense passion required by the statute. (*People v. Williams* (1991), 215 Ill. App. 3d 800, 576 N.E.2d 68.) Second, passion alone is insufficient. (*People v. Schorle* (1990), 206 Ill. App. 3d 748, 565 N.E.2d 84.) There

must be a sufficient serious provocation to result in a finding of second degree murder. As a result, mere words or gestures, even if they result in an admission of adultery and comment negatively on the party's sexual prowess, are still considered insufficient provocation. (*Chevalier*, 131 Ill. 2d at 75.) Consequently, regardless of what Bessie said to the defendant that night, there is no support for a finding of second degree murder because the only potential provocation for the defendant's actions was the words of Bessie.

Finally, the defendant knew of the affair for a period of almost six months before the killing. The period of time between the discovery of the relationship between Hudson and Bessie and the killing is too attenuated for the defendant's conviction to be reduced to second degree murder. (*Schorle*, 206 Ill. App. 3d at 757.) Thus, even if Bessie and the defendant were married, reduction of the offense to second degree murder would not be warranted.

For all these reasons, the judgment of the circuit court is reversed and the cause remanded for a new trial.

Judgment reversed and remanded for a new trial.

McNAMARA and RAKOWSKI,* JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument before her death. Justice Thomas Rakowski was substituted on the panel. He has listened to the oral argument tape and has read the briefs.