NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180158-U

NO. 4-18-0158

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 12, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| DENISE WOODRING, | ) | No. 16CF95 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding that (1) the trial court did not abuse its discretion when it barred the testimony of a purported expert witness, (2) on this record, the appellate court was not able to conclude that defendant received ineffective assistance of counsel, and (3) the defendant's sentence was not excessive.

¶ 2    In March 2016, the State charged defendant, Denise Woodring, with aggravated driving under the influence of drugs (625 ILCS 5/11-501(d)(1)(F) (West 2014)), driving under the influence (*id.* § 11-501(a)(4)), and reckless homicide (720 ILCS 5/9-3(a) (West 2014)). The charges alleged that in March 2016, defendant drove under the influence of a combination of drugs that rendered her incapable of safely driving and that her driving was the proximate cause of Riyaz Nomani's death.

¶ 3    In November 2017, the trial court conducted defendant's bench trial at which defendant called Ronald Henson, Ph.D., to deliver an expert opinion regarding driving under the

influence and drowsy driving. However, the court sustained the State's objection that Henson was not qualified to testify as an expert witness in that field. Defendant also called Dr. Hassnain Syed, who had treated defendant and prescribed her medication, but defense counsel, seemingly for monetary reasons, failed to lay a proper foundation for Syed to testify as an expert witness. The court ultimately found defendant guilty of all counts and sentenced her to 12 years in prison.

¶ 4 Defendant appeals, arguing that (1) the trial court denied defendant her right to present a defense when it barred Henson's purported expert testimony, (2) trial counsel was ineffective for failing to (a) lay a proper foundation, seemingly for monetary reasons, for Syed to testify as an expert witness and (b) request that the court permit Henson to testify as an expert witness in other fields in which he was qualified, and (3) defendant's 12-year sentence was excessive.

¶ 5 We disagree and affirm the trial court's judgment.

¶ 6 I. BACKGROUND

¶ 7 A. Procedural History

¶ 8 In March 2016, the State charged defendant with aggravated driving under the influence of drugs (625 ILCS 5/11-501(d)(1)(F) (West 2014)), driving under the influence (*id.* § 11-501(a)(4)), and reckless homicide (720 ILCS 5/9-3(a) (West 2014)). The charges alleged that in March 2016, defendant drove under the influence of a combination of drugs that rendered her incapable of safely driving and that her driving was the proximate cause of the death of Riyaz Nomani.

¶ 9 In pretrial discovery, defendant disclosed that she intended to call Dr. Samir Sharma, Dr. Hassnain Syed, and Ronald Henson, Ph.D., as expert witnesses. According to defendant's disclosure, Syed would testify regarding (1) the psychological effects of different

prescription drugs, (2) the quantity of different drugs and their effects on defendant, (3) the amount of drugs required to affect defendant's ability to drive, and (4) his ultimate opinion as to whether defendant was capable of safely driving. Henson would testify as to (1) his study, knowledge, investigation, and experience concerning the issue of drug-impaired driving and standardized testing used for its detection, (2) studies conducted by the National Highway Traffic Safety Administration (NHTSA) concerning driving under the influence of drugs and alcohol, (3) NHTSA's investigation into distracted and drowsy driving, and (4) Henson's opinion as to whether he believed that defendant was under the influence of any drug or combination of drugs that rendered her incapable of safely driving at the time of the accident.

¶ 10                                  B. The Bench Trial

¶ 11          In November 2017, the trial court conducted defendant's bench trial.

¶ 12                                  1. *The State's Witnesses*

¶ 13          Charles Whitten testified that on the evening of March 16, 2016, he was driving east on Route 17 in Livingston County when he observed a black car behind him, which had been following him for some time. He observed an SUV come towards him and narrowly avoid scraping his car. He then looked in his mirror and saw the SUV collide with the black car behind him. Whitten pulled over and saw residents that lived nearby come outside, call 911, and attempt to assist the drivers.

¶ 14          Jillayne Farrell testified that she was driving west on Route 17 and saw an Equinox SUV approach her quickly from behind. The SUV swerved off the side of the road and passed her. What happened next occurred too quickly for Farrell to see, but the next thing she remembered observing was the Equinox in the middle of the road and another car in a ditch.

¶ 15          Stephen Coady testified that he was an expert in accident reconstruction. He

determined that the "cause of the traffic crash in this case would have been [defendant's SUV] crossing over from the westbound lane into the eastbound lane encroaching into the traffic of the eastbound BMW and impacting the BMW in the eastbound lane of traffic." Richard Vanko, another crash reconstructionist, testified that by using the event data recorder in defendant's vehicle, he determined that defendant's speed before the crash was between 71 and 77 miles per hour. Vanko testified that the speed limit for the road on which the crash occurred was 55 miles per hour. Vanko believed there was no indication of braking.

¶ 16 The parties stipulated that Nomani, the driver of the black car, died because of the injuries he suffered in the accident.

¶ 17 Special Agent Rodney Slayback, an Illinois State Police investigator, interviewed defendant at the hospital after the accident, and a DVD recording of that interview was admitted and played for the court during his direct examination. Slayback testified that defendant told him she was coming from a 3 p.m. doctor's appointment in Hinsdale, Illinois, but had gotten lost. Defendant said she had not been sleeping much because of the medication she was taking and her use of cocaine, which she said she had taken on the evening of March 14, 2016 (two days before the accident). Defendant told Slayback that on the morning of the accident, she had taken Norco, gabapentin, diazepam, and hydrocodone. In the afternoon, following her doctor's appointment, she took a Vicodin.

¶ 18 Slayback further testified that defendant told him that she had fallen asleep, drifted into the rumble strips, and after trying to correct, crashed into another vehicle. Slayback asked defendant if she felt okay driving. She replied that she was sleepy, tired, drowsy, and was typically not okay with driving and a friend would drive her to appointments. Defendant said that although she sometimes did not take her medicine as prescribed, she had done so on the day of the crash.

¶ 19    The parties stipulated that if called to testify, Dalton Shulz, the emergency medical technician that transported defendant to the hospital, would say that defendant told him she was "driving home from Chicago and may have fallen asleep."

¶ 20    Alexandra Baluka, a forensic scientist with the Illinois State Police who was certified as an expert in forensic toxicology and pharmacology, testified that the Illinois State Police Crime Lab produced a report that showed defendant had "no volatiles detected, no cocaine detected, benzoylecgonine at a level less than 100 micrograms per liter, nordiazepam at .25 milligrams per liter, hydrocodone at a level less than 10 micrograms per liter, and alprazolam at 15 micrograms per liter" in defendant's blood. Baluka explained that nordiazepam is "an antianxiety or an antidepressant drug," hydrocodone is "an opiate and commonly referred to as Vicodin," and alprazolam is "commonly referred to as Xanax." The lab report further showed that defendant had acetaminophen, cyclobenzaprine, hydrocodone, ibuprofen, phenytoin, fluoxetine, gabapentin, benzoylecgonine, temazepam, dihydrocodeine, oxazepam, nordiazepam, alprazolam, and hyrdoxyalprazolam detected in her urine. Baluka explained that the drugs in defendant's blood and urine could have side effects of drowsiness, impaired judgment, decreased coordination, and dizziness. Baluka testified that the drugs found in defendant's blood were at the therapeutic level but those drugs at the therapeutic level could nonetheless result in those side effects. Baluka also testified that the crime lab report alone could not establish whether a person was impaired.

¶ 21    Dr. Samir Sharma testified that defendant was his patient and to deal with the medical problems in her neck and lower back, Sharma had prescribed hydrocodone. Sharma explained that hydrocodone can impair memory, judgment, and coordination. Sharma requires his patients to sign a narcotic agreement policy that includes that the patient is not to operate heavy machinery. He also testified that he would recommend someone on alprazolam, nordiazepam, and

hydrocodone not operate heavy machinery.

¶ 22    Dr. Michael Kryza, an emergency room physician at Morris Hospital, testified that he treated defendant following the accident. At the hospital, in response to Kryza's questions, defendant said she did not have any chills, fatigue, or fever. He prescribed no additional medicine to defendant and noted that hospital records showed that defendant was on gabapentin, Norco, and Valium. The records also showed that defendant was a fall risk. When Kryza spoke to defendant, she was oriented as to person, place, and time and showed normal affect and judgment.

¶ 23    2. *The Defense Witnesses*

¶ 24    Jennifer Silvia, a physician's assistant, saw defendant at her doctor's appointment on the day of the accident and testified that defendant appeared to have normal functioning, comprehension, and judgment. However, they only interacted for approximately 15 minutes.

¶ 25    Dr. Hassnain Syed, one of defendant's primary care physicians, testified that he began seeing defendant in 2013 and prescribed her medication. Syed said when he began treating defendant, she was taking 90 tablets of alprazolam per month, so he gradually decreased the amount of alprazolam defendant would take to 30 lower strength tablets per month.

¶ 26    Defense counsel asked Syed what effect reducing the strength of defendant's tablets would have on her, and the State objected, arguing that it called for an improper expert opinion. In response, counsel requested that Syed be permitted to testify as an expert in the practice of family medicine. The trial court responded by saying that it had not heard a sufficient foundation about Syed's education or training with pharmaceuticals. The following exchange then occurred:

"THE COURT: If you would like to lay more foundation to get into this area, that would be fine; but at this point, there hasn't been sufficient foundation for him to testify concerning the physical effects of the pharmacology or toxicology

on the body.

[DEFENSE COUNSEL]: Okay. Do you have experience and education in the effects of drugs on a person's body?

[SYED]: Can I ask a follow up question?

THE COURT: Sure. Why not?

[SYED]: Am I giving testimony as an expert or am I just here as a physician of the patient?

THE COURT: Well, you need to ask [defense counsel] because he's called you.

[SYED]: Ah, okay.

[DEFENSE COUNSEL]: At this time, you are just going to be an occurrence witness. Okay?"

¶ 27    Syed then testified that he reduced defendant's dosage because he believed her problems could be controlled with the lower dose. He also noted that defendant was on pain medications at the time. The following exchange then occurred:

"[DEFENSE COUNSEL]: Okay. Would that have any problem with the combination of the two?

[ASSISTANT STATE'S ATTORNEY]: Judge, I'm going to object again. Now we're getting back into the field of toxicology, pharmacology.

[DEFENSE COUNSEL]: I don't think so, Your Honor.

[SYED]: So there was no—

THE COURT: Hold on, sir. Hold on, Doctor. I'm sorry.

[DEFENSE COUNSEL]: I think he would know because physicians would

normally check that chart to make sure that they don't give her something that would adversely interact with another drug. I think that's, every doctor can do that; and he can say he checked and it would or wouldn't adversely affect. I think that would be within his role as a doctor, family doctor.

THE COURT: [Assistant State's Attorney]?

[ASSISTANT STATE'S ATTORNEY]: That may very well be, Your Honor; but what we need to do or why people are tendered as experts is because they are testifying to something that's outside the norm of common knowledge. *** If he's going to have Dr. Syed testify to that, he needs to lay a foundation; and I'm not suggesting that Dr. Syed doesn't know that. We don't know that. That's the problem. We don't know. He hasn't laid the foundation for it, and I believe that that testimony is something that would be requiring of tendering him as an expert. That's outside the norm of common knowledge.

THE COURT: Right. [Defense counsel], do you want—I mean, it looked like you were ready to make arguments.

[DEFENSE COUNSEL]: Yeah. I think I'm just asking him did he check the chart to make sure that—

THE COURT: No. You asked him if he checked the chart. He said yes. Then you asked if there would be any adverse [e]ffects between the pain medication. So that would be expert. He's not—the proper foundation hasn't been laid. If you wish to do that, you may do that; but otherwise I'm going to sustain the objection.

[DEFENSE COUNSEL]: Can I have a brief moment with my doctor to see

if he—

THE COURT: Well, I think there's some rule about talking to a witness in the middle of their testimony.

[DEFENSE COUNSEL]: I'm just concerned if he's going to charge us.

THE COURT: Well, he probably is if you're going to have him testify as an expert, which is why he asked the same question.

[DEFENSE COUNSEL]: Okay. I guess it's been answered. That's fine. I think he just nodded. I think he just nodded.

THE COURT: Well, he asked the question. So, and I think it's pretty common for experts to charge for their testimony.

[DEFENSE COUNSEL]: Okay. I'm just going to use you as an occurrence witness."

¶ 28    Syed testified further that he never observed defendant have any problems with the drugs he prescribed her. He added that he saw defendant three to four times over the course of treating her, and she seemed physically okay and emotionally stable.

¶ 29    On cross-examination, Syed testified that he would not give advice to a patient about how to take a drug that he had not prescribed. The State asked Syed if he would tell a patient he or she "should feel free to drive while taking Xanax [(alprazolam)]," and Syed replied, "It depends on [the] patients." He said that the drug affects people differently and, for example, if a person experienced panic attacks while driving, he might recommend he or she take Xanax while driving. On redirect examination, Syed reported that he did not recall prohibiting defendant from driving.

¶ 30    Ronald Henson testified that he was an independent consultant in "drug and alcohol

related matters." He explained that he worked for "employers, insurance companies, civil law firms, and criminal law firms." He testified regarding his qualifications, which included that he was a graduate of the Illinois State Police Academy and had four college degrees. He explained that his associates and bachelor's degrees included course work related to drugs and alcohol. His master's degree was in public administration, and in his course work he "examined driving under the influence process and procedures for Illinois law enforcement." He had a Ph.D. from Walden University in Minnesota and had a residency at Indiana University at which "[t]he specialization was drug and alcohol testing in the workplace." Henson did not explain how long the residency lasted or provide any other details about it.

¶ 31        Henson testified that when he started as a police officer in 1981, he had specialized training in drugs, narcotics, and alcohol. He worked with the drug and narcotic undercover unit "for a period of time" and gave "lectures within the community with regard to drugs and alcohol for various community groups." Henson became an instructor at the University of Illinois Police Training Institute and "eventually rose to supervise the drug, narcotic and alcohol programming, including testing, evaluation, and identification programming." He also "ran advanced courses with regards to drug and narcotic identification as well as surveillance tactics, undercover purchase tactics, and so on regarding those substances."

¶ 32        Henson further testified that he started a drug and alcohol testing laboratory in the early 2000s for employers. He sold the laboratory 4 years later and since then worked as a consultant for approximately 12 years. Henson taught others in the proper collection and analysis of substances for drug testing and he also had done numerous urine and breath tests along with some blood tests. Henson also testified that he stays current on the latest developments in the field of impaired driving as it relates to alcohol, drugs, narcotics, distracted driving, and drowsy driving.

He explained that he had previously been qualified to testify as an expert in the fields of drug and narcotic testing, impaired driving, and field sobriety testing.

¶ 33          Defendant offered Henson "as an expert witness in the field of drug and narcotic testing and impaired driving, whether it's caused by drugs, narcotics, alcohol, distracted driving or what NHTSA refers to as drowsy driving." The trial court clarified, "So, you are seeking to have him qualified in two areas, drug and narcotic testing and impaired driving?" Defendant agreed.

¶ 34          The State conducted a *voir dire* examination of Henson that revealed he (1) was not a medical doctor, (2) did not know defendant, and (3) had not engaged in any evaluation of defendant. The State questioned Henson regarding his training and experience related to pharmacology and toxicology, and he testified that his college courses pertaining to those topics were "imbedded within the typical semester course work that dealt with the drug and narcotic course work." Henson also could not remember what type of courses they were, specifically, or "whether they were biology, science, or sociology classes."

¶ 35          The State renewed its objection, and the trial court responded that, "I'm struggling to see where there's been sufficient training, education, or experience in the field which is clearly specialized, toxicology or pharmacology." The court then concluded that Henson was not an expert in impaired driving, toxicology, or pharmacology but was an expert only in collection of samples for testing. Following the court's decision, defense counsel offered Henson's curriculum vitae (CV) for the court to review, and although the court accepted the CV into evidence, it said, "Well, there's nothing in [Henson's CV] that would cause me to change my mind concerning his training and experience in this area." Nonetheless, the court allowed defense counsel to attempt to lay more foundation.

¶ 36 Henson then testified that "all of my training on drowsy driving would be law enforcement training starting at the police academy." He then described his work as a police officer related to drowsy driving and studies of the NHTSA on drowsy driving. On further cross-examination, he explained that he was trained regarding the indicators of drowsy driving and how they could sometimes mirror indicators of impaired driving. The State renewed its objection to Henson's being certified as an expert in drowsy or impaired driving, and the trial court sustained the objection, noting that very little of Henson's experience related to drowsy driving.

¶ 37 Henson testified still further that he reviewed the police reports in this case, saying, "There was no standardized field sobriety tests or drug recognition evaluation or any other indication of an evaluation that there was impairment noted or associated with any substance." Defendant questioned Henson regarding (1) a test done on defendant at a hospital and (2) a laboratory report, but the State objected, and the trial court sustained those objections. Defense counsel never requested the opportunity to make—and the record does not contain—an offer of proof regarding what Henson's testimony would have been if he had been permitted to testify as to his opinion.

¶ 38 Dan Woodring, defendant's husband, explained that over the course of the days prior to the accident, he came home from his job to find defendant asleep. He worked the night shift at Kroger and would typically arrive home around 7 a.m. On the day of the accident, he woke defendant up because she needed to take their daughter to work around 8:50 a.m. Defendant seemed "fine" and aware of her surroundings. He did not know whether defendant had taken her prescription medications that morning. Woodring also testified that as defendant was driving to her appointment, she phoned him, and he attempted to give her directions because she had left the highway at the wrong exit.

¶ 39 Woodring also testified that he knew defendant had on occasion not taken her medication. He added that he never saw her take her medicine in excess of what was prescribed. He also had never seen her self-medicate or use cocaine.

¶ 40                          3. *The Trial Court's Ruling*

¶ 41 Defendant chose not to testify, and the State presented no rebuttal evidence. The trial court found defendant guilty of all counts.

¶ 42                    C. The Post-Trial Motion and Sentencing

¶ 43 In December 2017, defendant filed a motion for a new trial in which she argued that (1) the trial court erred by failing to permit Henson to testify as an expert witness and (2) the evidence failed to prove defendant guilty beyond a reasonable doubt. The court denied the motion.

¶ 44 In January 2018, the trial court conducted defendant's sentencing hearing and initially noted that defendant's convictions merged under the one-act, one-crime doctrine. Defendant submitted letters in mitigation from friends, family, and others that described her as a caring and compassionate person who helped others and was particularly devoted to her blind daughter. The letters described how defendant cared for her daughter while her husband worked and indicated how defendant's absence would cause immense hardship for the family. The letters also detailed defendant's grief and remorse resulting from the accident. One friend, Janice Peters, described defendant's opiate use and the ongoing impact of incarceration on defendant. An inmate who met defendant in the county jail submitted a letter describing defendant as a compassionate and loving person who was like a second mother to her and explained that defendant assisted her when her daughter died while she was in jail.

¶ 45 Defendant argued that the court should apply the extraordinary circumstance statutory provision that would warrant probation because defendant (1) did not intend to impair

herself but instead was taking her prescribed medication and (2) was affected by the opioid epidemic. See 625 ILCS 5/11-501(d)(2)(G) (West 2016). Defendant also argued in mitigation that (1) she did not contemplate her actions would cause serious harm, (2) the crime was unlikely to reoccur, (3) substantial grounds excused the behavior because she was taking prescription medications, (4) imprisonment would impose a substantial hardship on her family, particularly her blind stepdaughter, and (5) imprisonment would aggravate her medical conditions.

¶ 46          Defendant made a statement in allocution in which she said, "First thing I want to say is I am so sorry. I hope one day you can forgive me. I did not mean to do this. The way you love him, I am so sorry. And I apologize to my family. I am so sorry. I hope one day you all forgive me."

¶ 47          In aggravation, the State presented victim impact letters from the victim's family. The letters described the impact of the loss of their father and husband. They described him as a loving and caring father, who attended his children's sporting events and was very involved in his children's lives. His daughter described his impact on the lives of those around him, saying, "He lives on through the hearts and souls of those he loved and those who loved him back." His son described Dr. Nomani as "selfless" and someone who cared deeply for his children. Nomani's wife described the day of the accident, as well as Nomani's family life and how well-loved he was by his coworkers and patients. She described Nomani as "a very responsible, loving and caring husband and an amazing father." She also expressed her hope that defendant would learn and grow from this experience and wished defendant "happiness and peace."

¶ 48          The State, arguing for a sentence near the maximum, contended that a lengthy prison term was necessary both for deterrence and because defendant took a life.

¶ 49          Defendant's only prior crimes were three misdemeanors 20 years old. The trial

court determined that this lack of prior significant criminal activity was a mitigating factor. The court also concluded that (1) defendant was a law-abiding citizen unlikely to commit further crimes and (2) if she were sentenced to probation, she would likely be able to complete it. However, the court imposed a 12-year prison sentence, concluding it was necessary for society and to deter similar conduct.

¶ 50        This appeal followed.

¶ 51                                II. ANALYSIS

¶ 52        Defendant appeals, arguing that (1) the trial court denied defendant her right to present a defense when it barred Henson's purported expert testimony, (2) trial counsel was ineffective for failing to (a) lay a proper foundation, seemingly for monetary reasons, for Syed to testify as an expert witness and (b) request that the court permit Henson to testify as an expert witness in other fields in which he was qualified, and (3) defendant's 12-year sentence was excessive.

¶ 53        A. Defendant's Claim That the Trial Court Erred by Not Permitting Henson To

Testify as an Expert Witness

¶ 54        Defendant first contends that the trial court deprived defendant of her "right to present a complete defense" by barring Henson's purported expert testimony. Defendant asserts that Henson would have opined about whether defendant was under the influence of a combination of drugs that rendered her incapable of driving at the time of the accident. Strangely, instead of asserting that the court made an incorrect evidentiary ruling, defendant attempts to transform that ruling into a constitutional argument related to defendant's right to present a defense. Defendant's argument is unavailing.

¶ 55                        1. *The Law Concerning Expert Testimony*

¶ 56          " 'In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion.' " *People v. Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985 (quoting *People v. Enis*, 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164 (1990)). " 'There are no precise requirements regarding experience, education, scientific study, or training' of a proposed expert." *People v. Beck*, 2017 IL App (4th) 160654, ¶ 113, 90 N.E.3d 1083 (quoting *People v. Lovejoy*, 235 Ill. 2d 97, 125, 919 N.E.2d 843, 859 (2009)).

¶ 57          "The decision to qualify a witness as an expert rests within the sound discretion of the trial court." *Id.* *¶* 114. An abuse of discretion occurs "only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Id.*

¶ 58                                          2. *This Case*

¶ 59          We discussed Henson's background, training, and experience previously in this order (*supra* ¶¶ 30-37) and will not repeat that discussion here. On appeal, defendant claims that Henson, who is not a pharmacist or medical doctor of any kind, was qualified as an expert in impairment, pharmacology, and toxicology. Although defendant lists Henson's experience and qualifications, no part of his background so obviously qualified him as an expert that this court can conclude the trial court's decision to not accept his expert opinion constitutes an abuse of its discretion.

¶ 60          The trial court discussed Henson's supposed expertise as follows: "But here I'm struggling to see where there's been sufficient training, education or experience in the field which is clearly specialized, toxicology or pharmacology." The court noted that other people such as the court or defense counsel may have taken courses related to those subjects but that did not mean

- 16 -

that they were experts. The court continued,

"So I think what we're looking for is something above and beyond the average general knowledge that would assist the trier of fact; and I don't see anything in Mr. Henson's experience, background or training that would suggest that he has any expertise in the *** areas of toxicology or pharmacology, specifically, if we're going to be getting into the effects that certain drugs might have on a person."

¶ 61 Regarding defendant's contention that Henson was an expert in "drowsy driving," the trial court said, "But when I look at the knowledge, skill, experience, training or education here of Mr. Henson, I do not see anything that would suggest that he would be, would have more knowledge, training or experience than the average person in the areas of the effects of drugs on the body or impaired driving including drowsy driving." The court noted that none of Henson's experience or credentials seemed to specifically relate to drowsy driving, and added, "The only thing that [is] related to the drowsy driving, other than his experience as a police officer from some time ago, was this report that he read from NHTSA that's about 20 years old."

¶ 62 The question for this court is whether the trial court's decision to not permit Henson to testify as an expert witness was "arbitrary, fanciful, or unreasonable, such that no reasonable person" would make that decision. *Id.* On this record, the trial court's decision was not arbitrary, fanciful, or unreasonable. Instead, we view that decision as thoughtful, reasonable, and supported by the evidence before the court. Accordingly, we conclude that the trial court did not err when it ruled that Henson would not be permitted to testify as an expert witness.

¶ 63 3. *Defendant's Claim Does Not Raise a Constitutional Issue*

¶ 64 Defendant's argument—namely, that the trial court's ruling that Henson would not be allowed to testify as an expert witness amounted to a deprivation of defendant's right to present

- 17 -

a defense—is completely without merit. Defendant cites *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), as well as the federal and Illinois Constitutions in support of this contention, but they provide none.

¶ 65        *Crane* was a case in which the defendant attempted to introduce the circumstances of his confession in order to show the trier of fact that the credibility of that confession was questionable. The trial court in that case barred any evidence related to the voluntariness of the confession. Although the Supreme Court determined that this ruling was error, the Court added the following: "We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence." *Id.* at 689. Importantly, the Supreme Court wrote the following:

> "We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. [Citations.] That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' " *Id.* at 690-91.

¶ 66        In this case, defendant's argument has no merit because the trial court excluded Henson's purported expert opinion after finding it incompetent or unreliable. Specifically, the trial court found that Henson lacked the experience or qualifications to describe the interactions of a combination of drugs and how those could affect defendant's mind and body. In *Crane*, the

Supreme Court explicitly wrote that excluding evidence *in the absence of any valid state justification* is impermissible. *Id.* That is obviously not the situation in this case. Courts have a strong interest in excluding purported expert opinions that do not meet the standards for admissibility.

¶ 67          B. Defendant's Claim That She Received Ineffective Assistance of Counsel

¶ 68          Defendant contends that her trial counsel was ineffective for failing to (1) lay a proper foundation, seemingly for monetary reasons, for Syed to testify as an expert witness and (2) request that the court permit Henson to testify as an expert witness in other fields in which he was qualified. We will first discuss the law that applies to such a contention.

¶ 69                    1. *The Law*

¶ 70          All defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Pope*, 2020 IL App (4th) 180773, ¶ 61.

¶ 71          To demonstrate deficient performance, a defendant must show his counsel's performance fell below an objective standard of reasonableness. *Id.* ¶ 62. Because the constitution guarantees only reasonably competent counsel, it is not sufficient for a defendant to show that counsel's representation was imperfect. *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Instead, a defendant must show his counsel's representation undermined the proper functioning of the adversarial process to such an extent that the defendant was denied a fair trial. *Id.* (citing *Strickland*, 466 U.S. at 686).

¶ 72          To demonstrate prejudice, a defendant must show "that there is a 'reasonable

- 19 -

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Moore*, 2020 IL 124538, ¶ 29 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767). " 'The likelihood of a different result must be substantial, not just conceivable.' " *Pope*, 2020 IL App (4th) 180773, ¶ 63 (quoting *Harrington*, 562 U.S. at 112). " 'A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.' " *Id.* (quoting *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601).

¶ 73                                  2. *This Case*

¶ 74              a. Was Defense Counsel's Performance Deficient Regarding Witness Syed?

¶ 75              Defendant contends that her trial counsel acted deficiently by not attempting to lay a proper foundation for Syed to testify as an expert seemingly because counsel was afraid he would have to pay Syed for his expert testimony. Prior to trial, counsel disclosed Syed as an expert witness. During trial, counsel attempted to ask Syed about the interactions of the drugs that were in defendant's blood, but the trial court did not allow him to ask those questions because a proper foundation had not yet been laid for him to testify as an expert.

¶ 76              Astonishingly, counsel then asked to speak with Syed, who was still on the witness stand, but the trial court correctly informed counsel that it was improper to speak to a witness who is presenting testimony. (Because this is such an elementary error, it gives this court concern about the quality of representation defendant received.) Counsel replied, "I'm just concerned about if he's going to charge us." The court responded that Syed probably would. Counsel then said, "Okay. I guess it's been answered. That's fine. I think he just nodded. I think he just nodded." While not entirely clear, it seems reasonable to infer that Syed was nodding to confirm that he would charge either defendant or defense counsel for his expert opinion. The trial court seemed to

agree with this conclusion because it said, "Well, [Syed] asked the question. So, I think it's pretty common for experts to charge for their testimony."

¶ 77        Although the above dialogue leads us to have concerns about defendant's counsel's representation, that dialogue falls short—*on this record*—of the cases defendant cites in support of her claim of ineffective assistance. For instance, this case is not similar to *People v. Falls*, 235 Ill. App. 3d 558, 565-69, 601 N.E.2d 1276, 1281-84 (1992), in which the First District Appellate Court found trial counsel was ineffective for failing to fully litigate a murder case when the defendant was unable to pay full fees. In *Falls*, defense counsel had indicated that he could not try the case with appropriate zeal unless he was paid sufficiently. *Id.* Nor does *People v. Djurdjulov*, 2017 IL App (1st) 142258, ¶ 50, 86 N.E.3d 1139, apply, where the appellate court stated, "When a defendant shows indigence and the need for an expert, he has a right to fees [under section 113-3(d) of the Code of Criminal Procedure of 1963 (725 ILCS 5/113-3(d) (West 2012)),] regardless of whether the indigent defendant receives assistance of counsel from a court-appointed attorney." (Internal quotation marks omitted.) Because the record before us does not contain sufficient information to determine (1) defendant's financial situation at trial, (2) what discussion defense counsel and Syed may have had pertaining to his willingness—or ability—to testify as an expert witness, we conclude (for the reasons set forth *infra* ¶¶ 77-79) that defendant's claims of ineffective assistance of counsel regarding witness Syed would be better addressed in a postconviction petition. Doing so would eliminate the need for this court to guess about the questions we just raised.

¶ 78            b. Did Defense Counsel's Performance Regarding Witness

Syed Prejudice Defendant?

¶ 79        We conclude, *on the record before us*, it is impossible to determine that defendant

was prejudiced by counsel's questioning of Syed because counsel failed to make an offer of proof. Our analysis in this matter is guided by the Illinois Supreme Court's opinion in *People v. Veach*, 2017 IL 120649, ¶ 46, 89 N.E.3d 366, in which the court noted that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim."

¶ 80    Because counsel made no offer of proof, we have no way of knowing what Syed would have said if he had been able to offer the expert opinion counsel sought to elicit from Syed. See *People v. Pelo*, 404 Ill. App. 3d 839, 877, 942 N.E.2d 463, 495 (2010) ("[D]efendant's failure to make an adequate offer of proof deprives this court of the record necessary to determine whether the court abused its discretion by granting the State's motion *in limine* to exclude *** expert testimony."). We do not know whether Syed's testimony would have been beneficial to defendant. We also do not know whether the trial court would have permitted Syed to testify as an expert if counsel had appropriately attempted to lay a foundation for Syed to do so. Accordingly, we cannot determine, based upon this record, whether the result of the proceeding would have been different.

¶ 81    Defendant's claims would be better addressed in a postconviction petition.

¶ 82    c. Was Defense Counsel's Performance Deficient Regarding Witness Henson?

¶ 83    Similarly, we also cannot conclude that defense counsel performed deficiently by failing to attempt to lay a foundation for Henson to testify as an expert witness in some other field.

¶ 84    Counsel made no offer of proof related to (1) what foundation could be laid for Henson's other possible expertise and (2) what opinion Henson may have given as an expert in that other field. For all this court knows, defense counsel did not attempt to lay a foundation for Henson to testify as an expert in any other field because counsel believed Henson was not qualified to do so. Another possibility is that counsel knew that even if Henson was qualified to testify as

an expert in some other field, Henson's opinions in that field would have been unhelpful or possibly even detrimental to defendant's case. *On this record*, this court would be guessing as to what foundation, if any, could have been laid for Henson to testify as an expert in some other field. Accordingly, we cannot conclude that counsel performed deficiently.

¶ 85                    C. Defendant's 12-Year Sentence Was Not Excessive

¶ 86            Next, defendant argues that (1) the trial court improperly relied on the fact that defendant caused a death, a factor inherent in the offense, when sentencing defendant, (2) defendant's sentence "does not reflect adequate consideration of" the mitigating evidence or defendant's rehabilitative potential, and (3) "there were no significant factors in aggravation."

¶ 87                                      1. *The Law*

¶ 88            Courts review claims of excessive sentencing for an abuse of discretion. *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 99, 145 N.E.3d 544. The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To succeed on appeal, a defendant must show that the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Schnoor*, 2019 IL App (4th) 170571, ¶ 99 (citing *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656). A reviewing court will not substitute its judgment for that of the trial court merely because it may have weighed the factors differently. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56, 141 N.E.3d 320.

¶ 89                                      2. *This Case*

¶ 90            First, we conclude that the trial court did not rely on a factor inherent in the offense when sentencing defendant. A strong presumption exists that the court's sentence was based on proper legal reasoning. *Id.* ¶ 55. Defendant bears the burden of showing that her sentence was

based on an improper factor. *Id.* However, as the State points out, the court stated, "[M]any of the aggravating factors that would otherwise be argued are inclusive in the crime itself so I'm not considering those factors." Instead, the court noted, "I mean, if you don't give somebody the maximum sentence when they take another person's life, negligently or otherwise, what's the purpose of the range? Well, the purpose of the range is to consider all of the other factors." As the State notes, taken in context, it appears that the court was recognizing that the range is there to account for the "other factors," rather than the death itself. This context, taken with the presumption that the court based its sentence on proper legal reasoning, leads this court to conclude that the trial court did not consider a factor inherent in the offense when sentencing defendant.

¶ 91 Second, we do not conclude that defendant's sentence failed to reflect adequate consideration of the mitigating evidence. The trial court engaged in a lengthy and thoughtful discussion of the information presented to it during the sentencing hearing. Although we agree with defendant that she presented significant evidence in mitigation, nothing in the record suggests that the court failed to consider that evidence. The weight to be given to that evidence was a matter for the trial court's discretion.

¶ 92 Third, defendant argues that there were no "significant" factors in aggravation. We disagree. The trial court noted that deterrence was "a very, very strong factor," and we note that the need "to deter others from committing the same crime" is a statutory factor in aggravation. See 730 ILCS 5/5-5-3.2(a)(7) (West 2018). A major objective of the court was to fashion a sentence that would make people who are under the influence of drugs or alcohol think twice about gambling with the lives of others by getting behind the wheel of a vehicle. When evaluating the evidence presented at sentencing, the court repeatedly noted that defendant (1) knew she should not drive because her doctor told her so, (2) usually had someone else drive her because of the

effects of her medication, and (3) pulled over on the night of the accident because she was sleepy. The court was clearly seeking to deter others from engaging in similar conduct by imposing a 12-year sentence.

¶ 93　　　　Ultimately, the question before this court is not whether we would have come to the same conclusion if we were the trial court; instead, the question is whether the trial court abused its discretion. We conclude that the court did not.

¶ 94　　　　　　　　　　　　III. CONCLUSION

¶ 95　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 96　　　　Affirmed.